**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| THOMAS MELONE,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL F. HANLEY, CAROLYN ANDERSON in her capacity of Chair of the Vermont Professional Responsibility Board, and JON ALEXANDER in his official capacity of Disciplinary Counsel of the Vermont Professional Responsibility Board, WALTER FRENCH, ALEXANDER SHRIVER and BRIAN BANNON in their official capacities as members of Hearing Panel assigned to PRB Case 120-2025,<br><br>    Defendants. | Case No. 2:26-cv-38-mkl |

_____

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS, ECF 23**

_____

Dated: May 4, 2026

Thomas Melone
601 S Ocean Blvd.
Delray Beach, FL 33483
Phone: (212) 681-1120
Email: Thomas.Melone@AllcoUS.com

TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES.................................................................................... iv

INTRODUCTION ................................................................................................... 1

A.  HISTORICAL BACKGROUND: THE COMMON LAW ORIGINS AND
    LIMITS OF ATTORNEY DISCIPLINE ...................................................... 1

B.  FACTUAL AND PROCEDURAL BACKGROUND ..................................... 4

STANDARD OF REVIEW...................................................................................... 7

ARGUMENT............................................................................................................ 8

I.    IT IS PREMATURE TO CONSIDER GRANTING THE MOTION TO
      DISMISS WITHOUT THE BENEFIT OF LIMITED DISCOVERY .................... 8

II.   THE VITAL STATE INTEREST PRONG OF YOUNGER IS NOT
      SATISFIED BECAUSE A STATE HAS NO VITAL INTEREST IN
      UNCONSTITUTIONALLY REGULATING SPEECH....................................... 11

III.  DOMBROWSKI REQUIRES THE DENIAL OF ABSTENTION........................ 13

IV.   YOUNGER ABSTENTION IS INAPPLICABLE WHEN IT
      ELIMINATES RATHER THAN PRESERVES THE ROLE OF A JURY .......... 14

V.    THE BAD FAITH AND RELATED EXCEPTIONS DEFEAT YOUNGER
      ABSTENTION ................................................................................................. 16

      A.  Hanley Admitted on the Record That He Lacked Probable Cause for
          the Lead Count.................................................................................... 17

      B.  The Entire Evidentiary Basis of the Petition Is Immunized by Noerr-
          Pennington, and the Petition Does Not and Cannot Allege Sham
          Litigation............................................................................................. 17

      C.  The Chain of Conflicted Appointments Establishes Bad Faith and
          Retaliatory Motive .............................................................................. 18

      D.  Hanley's February 11, 2026 Filing Threatened Additional Charges
          as Punishment for Exercising the Right to Defend.............................. 19

      E.  Screening Counsel's Referral Was Limited to Two Rules; Hanley
          Brought Eight Counts.......................................................................... 19

      F.  Count II Had No Legitimate Purpose — Criminal Prosecution Was
          Legally Impossible Before the Conduct at Issue Occurred ................. 19

      G.  Count V Is Self-Defeating on Its Own Terms...................................... 20

      H.  The Probable Cause Affidavit Was Facially Deficient and
          Fraudulently Presented ....................................................................... 20

      I.   Defendants' Professional-Discipline Authorities Are Materially
           Distinguishable .................................................................................. 21

VI.  THE STATE FORUM IS CONSTITUTIONALLY INADEQUATE....................26

    A.  No Interlocutory Constitutional Review Exists — Established by Three Successive Orders................................................................26

    B.  Anderson Invoked Quasi-Judicial Immunity to Block All Discovery of Her Own *Ex Parte* Communications......................................27

    C.  The Hearing Panel Has No Validly Appointed Chair — Its Actions Are Void *Ab Initio*................................................................28

    D.  Structural Conflicts Permeate Every Level of the State Forum...................28

    E.  The Vermont Supreme Court Cannot Serve as a Neutral Appellate Forum................................................................29

VII.  THE FRAMERS VESTED FEDERAL COURTS WITH JURISDICTION OVER PRECISELY THIS CATEGORY OF DISPUTE, AND ABSTENTION WOULD REQUIRE THE VERMONT SUPREME COURT TO ADJUDICATE WHETHER ITS OWN RULES AND CONDUCT VIOLATE THE UNITED STATES CONSTITUTION ....................30

VIII.  THE PRB FORUM CANNOT GRANT THE RELIEF THE FACIAL CONSTITUTIONAL CHALLENGES SEEK; THE *MIDDLESEX* ADEQUATE-OPPORTUNITY PRONG FAILS AS TO THOSE CLAIMS .........32

IX.  RULE-BY-RULE ANALYSIS: EACH CHALLENGED RULE IS A PRESUMPTIVELY INVALID CONTENT-BASED SPEECH RESTRICTION THAT CANNOT SURVIVE FIRST AMENDMENT STRICT SCRUTINY ................................................................33

    A.  Rule 8.4(d) — "Conduct Prejudicial to the Administration of Justice" (All Eight Counts) ........................................................33

    B.  Rule 3.5(d) — "Undignified or Discourteous Conduct Degrading to a Tribunal" (Counts I, III)........................................................35

    C.  Rule 4.5 — "Threatening Criminal Charges to Obtain Advantage in a Civil Matter" (Counts I, II)........................................................35

    D.  Rule 3.3(a)(1) — "Knowing False Statement of Fact or Law to a Tribunal" (Counts V, VI)........................................................36

    E.  Rule 4.4(a) — "Means With No Substantial Purpose Other Than to Embarrass, Delay, or Burden" (Counts V, VI)........................................37

    F.  Rule 3.1 — "Meritorious Claims and Contentions" (Count V) ...................37

    G.  Rule 4.2 — "Communication with Person Represented by Counsel" (Count VII)................................................................38

    H.  Rules 4.3 and 3.5(b)(1) — Candor and Ex Parte Restrictions as Applied (Counts I, III, IV) ........................................................38

    I.  Count VIII — The Cumulative Pattern Theory........................................39

X.  THE FIRST AMENDMENT RETALIATION CLAIM CANNOT BE

DEFERRED BY *YOUNGER* ABSTENTION BECAUSE THE
CONSTITUTIONAL VIOLATION IS THE PROCEEDING ITSELF ................. 39

XI.    THE FIRST AMENDMENT'S PROTECTION DOES NOT DIMINISH
BECAUSE THE SPEAKER IS AN ATTORNEY ................................................. 41

XII.   *YOUNGER* ABSTENTION IS UNCONSTITUTIONAL AS APPLIED
TO SECTION 1983 CLAIMS, AND MUST AT MINIMUM BE
CONSTRUED NARROWLY TO AVOID SERIOUS
CONSTITUTIONAL DIFFICULTIES .................................................................. 42

A.    *Younger* Abstention Is a Judge-Made Prudential Doctrine, Not a
Constitutional Command, and Congress Has Already Resolved the
Balance It Purports to Strike .................................................................... 43

B.    *Mitchum v. Foster* Establishes That Congress Expressly Authorized
Federal Injunctions of State Proceedings in Section 1983 Cases;
Younger Abstention Cannot Undo That Authorization .............................. 44

C.    At Minimum, Constitutional Avoidance Requires That Younger's
Exceptions Be Applied Robustly Rather Than Grudgingly.......................... 44

CONCLUSION....................................................................................................... 45

# TABLE OF AUTHORITIES

### CASES

*Anonymous v. Ass'n of the Bar*, 515 F.2d 427 (2d Cir. 1975) ................................21, 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................10

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983) ................................37

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ...........................................38

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) .........................................29

*Cerame v. Slack*, 123 F.4th 72 (2d Cir. 2024) ................................................... 41-42

*Chalidze v. Hanley*, No. 77-1-05 Rdcv (Vt. Super. 2005) ......................................5, 28

*Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024) ...........................................5, 20

*City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp. 2d 332
    (E.D.N.Y. 2008) ....................................................................................................7

*Cohen v. California*, 403 U.S. 15 (1971) ...............................................................35

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821) ........................................... 30-31

*Collins v. United States*, 996 F.3d 102 (2d Cir. 2021) ........................................ 7-8

*Collins v. Yellen*, 594 U.S. 220 (2021) ...............................................................6, 28

*Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191 (2d Cir. 2002) ........8, 9, 17, 19, 22

*Diamond v. Vickrey*, 134 Vt. 585 (1976) ...............................................................20

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ............................................... 9, 13-14, 39

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S.
    127 (1961) ...........................................................................................................2

*Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136 (1st Cir. 2008) ................. 26-27

*First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. ___,
    No. 24-781 (Apr. 29, 2026) .......................................................................... passim

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) ....................................... passim

*Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) ........................................17

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................35

*Hartman v. Moore*, 547 U.S. 250 (2006) ...............................................................40

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) .............................................9, 33, 34, 35, 36

*Igbanugo v. Minnesota OLPR*, 56 F.4th 561 (8th Cir. 2022) ........................... 21, 22-23

*Kennedy v. Rockwell*, 2012 WL 3637237 (D. Vt. Aug. 21, 2012) ........................21, 25

*Kern v. Clark*, 331 F.3d 9 (2d Cir. 2003) .............................................................8, 25

*Klayman v. Fox*, 2019 WL 2396538 (D.D.C. June 5, 2019) ................................21, 23

*Lucia v. SEC*, 585 U.S. 237 (2018) ...............................................................................28

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ................................................................33, 34, 35

*Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) .................................................................................................................... passim

*Miller v. Sutton*, 2016 WL 3976540 (D. Conn. July 21, 2016) ................................. 8, 21, 24-25

*Mitchum v. Foster*, 407 U.S. 225 (1972) .......................................................................44

*Munster v. Lamb*, 11 Q.B.D. 588 (C.A. 1883) ............................................21, 22, 24, 25

*Nat'l Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ............... 2-3, 11, 41

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) ...........................8

*PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92 (2d Cir. 2000) ...................... 17-18

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .................................................9, 33, 34

*Revson v. Cinque & Cinque*, 221 F.3d 71 (2d Cir. 2000) ........................................17, 36

*Rosellini v. Wilcox*, No. 22-2610, 2025 WL 401206 (3d Cir. Feb. 5, 2025) .........................21, 22

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ......................................35

*Roshan v. McCauley*, 130 F.4th 780 (9th Cir. 2025) ...............................................21, 22

*Ryder v. United States*, 515 U.S. 177 (1995) ...............................................................28

*Scanlon v. Cty. of L.A.*, 92 F.4th 781 (9th Cir. 2024) ...................................................21

*SEC v. Jarkesy*, 603 U.S. 109 (2024) ..................................................................... 15-16

*Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65 (2d Cir. 2003) .......................................................................................21, 23-24, 26-27

*Spevack v. Klein*, 385 U.S. 511 (1967) ........................................................................2

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) .........................................................8, 24

*T.F.T.F. Cap. Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90 (2d Cir. 2002) .....................................18

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ...............................................10

*Vereline v. Woodsville Guar. Sav. Bank*, No. 5:15-cv-00176, 2015 U.S. Dist. LEXIS 167926 (D. Vt. Dec. 16, 2015) ...............................................................7

*Vermont League of Cities and Towns v. Lewellyn*, No. 197-4-16 Wrcv (Vt. Super.) ..................................................................................................5, 28

*Wassef v. Tibben*, 68 F.4th 1083 (8th Cir. 2023) ...................................................21, 22

*In re Wright*, 131 Vt. 473 (1973) ....................................................................3, 21, 39

*Younger v. Harris*, 401 U.S. 37 (1971) ................................................................ passim

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................45

STATUTES AND CONSTITUTIONAL PROVISIONS

18 U.S.C. § 3282 ......................................................................................................19

28 U.S.C. § 1343(a)(3) ...........................................................................................7

28 U.S.C. § 2283 (Anti-Injunction Act) ...............................................................44

30 V.S.A. § 248 ....................................................................................................21

42 U.S.C. § 1983 .......................................................................................... passim

Civil Rights Act of 1871 ......................................................................................43

U.S. Const. art. III .......................................................................................... passim

U.S. Const. amend. I ....................................................................................... passim

U.S. Const. amend. V .......................................................................................2, 15

U.S. Const. amend. VII .................................................................................... 15-16

V.R.A.P. 5(b) .......................................................................................................27

Vermont Administrative Order 9 (A.O. 9) ...................................................... passim

Vermont Rules of Professional Conduct 3.1 ....................................... 4, 12, 19, 32, 37-38

Vermont Rules of Professional Conduct 3.3(a)(1) ......................... 12, 21, 22, 32, 36-37

Vermont Rules of Professional Conduct 3.5(b)(1) ...................................... 5, 6, 12, 38-39

Vermont Rules of Professional Conduct 3.5(d) .......................................12, 13, 32, 35

Vermont Rules of Professional Conduct 4.2 ....................................4, 12, 19, 32, 38

Vermont Rules of Professional Conduct 4.3 ......................................................32, 38

Vermont Rules of Professional Conduct 4.4(a) ...........................................12, 32, 37

Vermont Rules of Professional Conduct 4.5 ........................................ 10, 12, 13, 19, 32, 35-36

Vermont Rules of Professional Conduct 8.3(a) ....................................................4, 32

Vermont Rules of Professional Conduct 8.4(d) ............................... 10, 12, 13, 32, 33-35

PRB Policy 22 ....................................................................................................6, 27

**OTHER AUTHORITIES**

ABA Formal Op. 92-363 (July 6, 1992) ..................................................................36

3 William Blackstone, *Commentaries on the Laws of England* (1780) ................................. 15-16

Alexander Hamilton, *The Federalist No. 80* ........................................................29, 30

*Letter from John Adams to Ebenezer Thayer* (Sept. 24, 1765) ......................................16

*Restatement (Second) of Torts* § 586 (1977) ...........................................21, 22, 24, 25, 38

Fred O. Smith Jr., *Younger and Older Abstention*, 123 Mich. L. Rev. 1449
    (2025) .......................................................................................................... 9, 14-16

5B Charles Alan Wright et al., *Federal Practice & Procedure* (3d ed.) .......................................7

**INTRODUCTION**

Like the attorney in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), the Plaintiff's speech sought to be punished by the Defendants is "classic political speech." *Id*. at 1034.[1] Also like *Gentile*, "this case involves punishment of pure speech in the political forum." *Id*. Such speech lies "at the core of the First Amendment." *Id*. at 1035 (internal citation and quotation omitted.) Also here, as in *Gentile*, the State "seeks to punish the dissemination of information relating to alleged governmental misconduct." *Id*. at 1034-5.

*Gentile* grappled with the question of whether the traditional Oliver Wendall Holmes "clear and present danger" formulation under the First Amendment needed to be expressed in those words in a rule regulating attorney speech, or whether the same notion could be expressed in other words but still be restricted to conveying the same "clear and present danger" narrow exception to protected First Amendment speech. The majority of the Court held a "rule governing speech, even speech entitled to full constitutional protection, need not use the words 'clear and present danger' in order to pass constitutional muster." *Id.* at 1036.  A majority of the Court subscribed to the view that whatever words are used, only speech that equated to a clear and present (*i.e.*, imminent) danger to the fair administration of justice could be regulated without running afoul of the First Amendment.  Plaintiff's speech that the Defendants seek to penalize is light years away from the clear and present danger requirement of *Gentile*.   Defendants move to dismiss solely on the ground that this Court should abstain under *Younger v. Harris*, 401 U.S. 37 (1971). The motion fails for multiple independent reasons, each sufficient on its own to defeat abstention.

**A. HISTORICAL BACKGROUND: THE COMMON LAW ORIGINS AND LIMITS OF ATTORNEY DISCIPLINE.**

At common law, the power to discipline attorneys arose from a single, narrow source: the inherent authority of courts to regulate their own officers. Attorneys were officers of the court, and courts disciplined them to protect the integrity of judicial proceedings and to safeguard clients from financial betrayal. The paradigmatic disciplinary offenses were misappropriation of client

---

[1] Part I of the Court's *Gentile* opinion was delivered by REHNQUIST, C. J., in which WHITE, O'CONNOR, SCALIA, and SOUTER, JJ, joined.

1

funds, abandonment of clients, fraud on the tribunal, and criminal conduct demonstrating moral unfitness. Conspicuously absent from every common law account of discipline is any suggestion that courts could sanction an attorney for the content of arguments made in proceedings — for what he said on behalf of a client or in his own interest, rather than for fraud in procuring a judgment or theft from the client he served. That silence was not an oversight; it was a considered constitutional principle. The power to discipline was the power to protect, not the power to suppress.

The reason no common law authority supported discipline for advocacy speech is that such speech was absolutely protected. The *Noerr-Pennington* doctrine, which immunizes all eight counts of the Petition in this case, is in critical part the constitutional expression of this ancient common law privilege — the recognition that petitioning the government, including through litigation and regulatory advocacy, cannot be made the basis of civil or quasi-criminal liability. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-38 (1961). A disciplinary system that punishes the content of regulatory filings does not regulate attorneys — it silences them. The common law recognized and guarded against exactly that danger.

Equally important is what common law tradition understood about the proper source of a disciplinary complaint. Discipline was initiated by courts acting on their own authority or by disinterested officers charged with maintaining professional standards — never by a litigant with a direct stake in eliminating opposing counsel. That is precisely the posture of this case. The complaint was filed by Merrill Bent during active adversarial proceedings in which Plaintiff's filings formed the entirety of the evidence for seven of eight counts. ECF 1 ¶6. The bar's machinery was thus set in motion by the very party whose interest the proceedings most directly served.

The Supreme Court has long grounded attorney discipline in the constitutional principles that animate this common law tradition. In *Spevack v. Klein*, 385 U.S. 511, 514 (1967), the Court held definitively that attorneys retain the full protection of the Fifth Amendment — they do not forfeit constitutional rights by becoming members of the bar. *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (*Becerra*) likewise confirms that the First

2

Amendment fully protects professional speech. *Id*. at 2371-72 ("this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'") *Gentile* too confirms that the majority of the Court viewed the only recognized exception to blanket First Amendment protection of attorney speech in the context of a State disciplinary proceedings is a rule that replicates the traditional Holmes' "clear and present danger" standard. These holdings are not novelties; they are the constitutional translation of the common law tradition this section describes.

The Petition of Misconduct against Plaintiff (the "**Petition**") inverts every one of these principles. Each of the eight counts rests on presumptively unconstitutional "[c]ontent-based regulations [that] target speech based on its communicative content. [] As a general matter, such laws are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. This stringent standard reflects the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Becerra*, 138 S. Ct. at 2371 (internal citations and quotations omitted). Each of the eight counts rests on statements Plaintiff made in governmental and judicial proceedings — filings with the Vermont Public Utility Commission ("**PUC**"), testimony before the PUC, communications with government officials, and appeals to the Vermont courts. These are not the historical categories of disciplinable conduct. They are the historical categories of absolutely protected advocacy.

Petition count VIII, which seeks disbarment based on a purported "consistent pattern" of such advocacy, invokes *In re Wright*, 131 Vt. 473 (1973) — a case involving the quintessential common law offense of repeated personal financial self-dealing and self-enrichment at clients' expense. The actual *Wright* language speaks of "a consistent pattern of **benefits to himself and family**." 131 Vt. at 493 (emphasis added). The Petition omits those words, stripping *Wright* of its entire common law grounding and attempting to repurpose a case about financial predation as authority to punish regulatory advocacy. That truncation is not merely a misquotation; it is a window into the nature of this proceeding. Where common law tradition built disciplinary power

3

on protecting clients from financial betrayal, the Petition seeks to punish speech that displeases a litigation adversary. The gap between historical principle and present practice is not incidental — it is the constitutional violation this Court is being asked to remedy.

## B.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a Vermont-licensed attorney who, in his own name and through entities he owns, has spent thirteen years developing two two-megawatt solar facilities in Bennington, Vermont. He has never had a disciplinary complaint filed against him in any of the other seven states in which he is licensed. ECF 1 ¶9. In January 2025, in response to a motion filed by the Vermont Department of Public Service ("**DPS**") (and supported by Merrill Bent), Plaintiff filed comments with the PUC publicly disclosing alleged governmental malfeasance by the Town of Bennington ("**Town**") in connection with the expiration of the Town Plan, *see* ECF 1-1, ECF 1 ¶2, and then later disclosing Merrill Bent's firm's potential role in that malfeasance, *see* ECF 1-2, ECF 1 ¶16. Soon thereafter, Merrill Bent — the Town's attorney, the chair of Vermont's Judicial Conduct Board ("**JCB**"), and Plaintiff's active adversary in PUC and other proceedings — filed a complaint with the Professional Responsibility Board ("**PRB**"), docketed as PRB Case 120-2025. Bent's complaint was screened by Screening Counsel Andrew Strauss, who referred it to Disciplinary Counsel Jon Alexander with an explicit limitation: Strauss identified only potential violations of Rules 4.2 and 3.1 as "the most clear" and expressly noted that Bent's "other claims of Rule violations" were not sufficiently clear to refer. *See* ECF 24-1. Jon Alexander immediately recused himself, stating in writing that he could not take the case because he is Special Counsel to the JCB reporting directly to Bent on his investigations and prosecutions. *Id.*

Anderson — the PRB Chair, who was previously Associate General Counsel and Chief Compliance Officer of Green Mountain Power Corporation ("**GMP**"), an entity with active and threatened litigation against Plaintiff, and now is an energy consultant, *see* ECF 1-5, ECF 1 ¶22— purportedly appointed Michael Hanley as Conflict Disciplinary Counsel. Carolyn Anderson recused herself from PRB Case 120-2025, *see* ECF 24-7, but not before (i) she purportedly appointed Michael Hanley to pursue charges against Plaintiff, and (ii) later engaged in *ex parte*

communications with Hanley and the initial Hearing Panel ("**HP**") chair, Mimi Brill, related to Mimi Brill's inquiries into the improper appointment of Hanley.

Mr. Hanley (whose appointment Plaintiff challenges and Mimi Brill questioned because there is no evidence of Anderson appointing Hanley) himself has a history that raises further questions about the appropriateness of his purported appointment in any ethics case, having a history being sued for malicious prosecution and for obtaining insurance proceeds by making false statements.[2]   Hanley, himself a former PRB Chair, represents solar developers who are direct competitors of Plaintiff's projects, *see* ECF 1 ¶23. Without disclosing these conflicts to the probable cause panel, Hanley filed a three-page affidavit that, *inter alia*, contained no documentary evidence, failed to analyze probable cause count by count as required by *Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024), and omitted controlling Second Circuit precedent that foreclosed a principal theory of liability. *See* ECF 1 ¶26.

Hanley then filed the Petition — six more than Strauss had found supported, one of which he neither sought nor received a probable cause finding (*i.e.*, Rule 3.5(b)(1), *see* ECF 1-5)— based entirely on documents Plaintiff filed with, or sent to, governmental entities in the course of his litigation and advocacy. Count VIII seeks disbarment and is based on conduct in seven specific cases in this District that were presided over by the judges before whom this motion is pending.

Plaintiff has attempted to obtain interlocutory constitutional review in the state forum on three occasions. On October 30, 2025, the Vermont Supreme Court denied his petition for extraordinary relief without explanation. *See*, Case No. 25-AP-366. A motion for clarification was subsequently denied without explanation. *Id*.  The HP denied his motion for permission to appeal

---

[2] Examples include:
  i.   Lisa Chalidze, Esq., a Vermont attorney, filed suit against Mr. Hanley in the Vermont Superior Court, Rutland County, Docket No. 77-1-05 Rdcv ("*Chalidze*") asserting claims against Mr. Hanley for abuse of process, malicious prosecution, breach of contract, breach of fiduciary duty, civil conspiracy, and punitive damages. The factual allegations are directly relevant here. The *Chalidze* complaint alleged that Mr. Hanley, acting in concert with co-defendants, had prosecuted a prior lawsuit against Ms. Chalidze without probable cause, maliciously, and in bad faith — specifically to coerce her into illegal fee-splitting in connection with a federal bankruptcy matter and to cause her to forego her valid claims. *See* ECF 24-2.
  ii.  In a lawsuit filed by the Vermont League of Cities and Towns, Mr. Hanley and his law firm, Plante & Hanley, were sued for making false statements in connection with obtaining insurance proceeds. *See*, *VERMONT LEAGUE OF CITIES AND TOWNS PROPERTY AND CASUALTY INTERMUNICIPAL FUND*, plaintiff v. *DEBORAH LOCKE et al.*, defendants *v. MICHAEL F. HANLEY AND PLANTE & HANLEY*, third party defendants, docket 197-4-16 Wrcv.  Mr. Hanley's then continued to represent himself and another party in that lawsuit after he personally became a defendant.

on January 5, 2026, holding that no interlocutory appellate mechanism of any kind exists under A.O. 9. On February 6, 2026, the Vermont Supreme Court again denied review. *See*, Case No. 26-AP-024. In the process, every judge of the Vermont Supreme Court who signed those orders — including Chief Justice Reiber — was also the judicial officer whose September 2025 Administrative Appointment created the very PRB apparatus under challenge by appointing Carolyn Anderson as PRB Chair.

The forum has since further deteriorated. Mimi Brill was the initial chair of the hearing panel assigned by Ms. Grutchfield to PRB case 120-2025. *See* ECF 24-3. Mimi Brill undertook *sua sponte* (in her words on behalf of the entire hearing panel including Defendants Alexander Shriver and Brian Bannon) to investigate whether Michael Hanley was properly appointed because there was no written evidence indicating that Michael Hanley was properly appointed once Jon Alexander recused himself. [3] HP Chair Mimi Brill wrote to Anderson on December 3, 2025, and again on January 12, 2026, seeking clarification as to whether Mr. Hanley was properly appointed. That a sitting HP Chair felt compelled to ask the question — twice — is itself an admission that the appointment record was facially insufficient.

Carolyn Anderson *ex parte* alerted Michael Hanley that Mimi Brill was questioning his appointment. Hanley then filed a motion to recuse Mimi Brill, causing Mimi Brill, to recuse herself.[4] After Mimi Brill recused herself on February 12, 2026, PRB Vice-Chair Caryn Waxman purported to appoint Walter French as the new HP Chair. *See* ECF 24-7. A.O. 9 contains no authority for the Vice-Chair to exercise the Chair's appointment power, making the appointment void *ab initio*. *Collins v. Yellen*, 594 U.S. 220 (2021).[5] The new chair's spouse is a Vermont probate

---

[3] The sole document tendered as evidence of Mr. Hanley's appointment is a one-page letter dated May 20, 2025 from PRB Program Administrator Merrick Grutchfield *thanking* Mr. Hanley for his agreement to serve. That letter does not identify the appointing authority. It does not recite a formal act of appointment. It states no date of appointment. It is a staff acknowledgment, not an appointment instrument. Under Permanent Rules Governing Establishment and Operation of the Professional Responsibility Program ("**A.O. 9**") and PRB Policy 22, only the Chair of the Board may appoint Conflict Disciplinary Counsel. The Board's own published note to the 2021 amendment of the predecessor of Policy 22 confirms that the Policy was "adopted to clarify that the Board chair, not staff, assigns conflict counsel." The PRB itself recognized the defect in the appointment record.

[4] Anderson apparently responded to Brill and forwarded the response to Mr. Hanley as an *ex parte* communication, without notice to Plaintiff. The *ex parte* response did not — and could not — cure the antecedent defect. It instead added a fresh due-process violation on top of the original one. Shriver and Bannon have refused without explanation to recuse themselves.

[5] Plaintiff has filed a complaint, Case No. 26-AP-145, with the Vermont Supreme Court seeking relief in the nature of a writ of *quo warranto* and a writ of prohibition restraining the PRB Vice-Chair from exercising appointment

judge whose law firm's Agent for Service of Process was updated to Karl Anderson — Carolyn Anderson's husband — just thirty days before French's appointment. French, in his first act as purported Chair, refused to recuse the remaining panel members without disclosing that relationship and without disclosing that Shriver's represented French in a lawsuit against the U.S. Selective Service, *see* ECF 24, fn.13. In a letter written while the appointment was likely under consideration, *see* ECF 24-12, French expressed that he considers anyone who has ever "approved of Trump, even tacitly" to be among the "darkest most hateful parts of Vermont" — a statement directly applicable to Plaintiff, whose public positions align with the Administration's on offshore wind and administrative overreach. *See, e.g.*, ECF 24, fn.11.

Plaintiff filed this action on February 18, 2026, seeking to enjoin the PRB proceedings and the enforcement of certain of the Vermont Rules of Professional Conduct ("**VRPC**") on constitutional and 42 U.S.C. §1983 grounds. This Court has original jurisdiction under Article III, Section 2, and 28 U.S.C. §1343(a)(3) over the claims made in the Complaint. Defendants filed a motion to dismiss on April 2, 2026, asserting *Younger* abstention as their sole basis for dismissal.

## STANDARD OF REVIEW

A motion to dismiss based on the abstention doctrine typically is analyzed under Rule 12(b)(1). *Vereline v. Woodsville Guar. Sav. Bank*, No. 5:15-cv-00176, 2015 U.S. Dist. LEXIS 167926 (D. Vt. Dec. 16, 2015); *City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 341 (E.D.N.Y. 2008) ("A motion to dismiss based on the abstention doctrine is also considered as a motion made pursuant to Rule 12(b)(1)."); 5B Charles Alan Wright et al., Federal Practice & Procedure § 1350 (3d ed.) ("Courts have recognized a variety of other defenses that one normally would not think of as raising subject-matter jurisdiction questions when considering a Rule 12(b)(1) motion, such as claims that... the subject matter is one over which the federal court should abstain from exercising jurisdiction.").  "In resolving a motion to dismiss under Rule 12(b)(l), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Collins v. United*

---

powers A.O. 9 does not confer, and restraining Walter French from exercising any powers.

7

*States*, 996 F.3d 102, 105 n.l (2d Cir. 2021) (quotations and citations omitted).

**ARGUMENT**

"[F]ederal courts have a virtually unflagging obligation to exercise the jurisdiction given them." *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. ___, No. 24-781 (Apr. 29, 2026) (unanimous) (*First Choice*) (slip op. at 14) (internal citations and quotations omitted). *Younger* abstention, which has no constitutional grounding, represents "a narrow exception to that obligation" and is limited to "exceptional" circumstances. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 367-368 (1989) (*NOPSI*). It is not a general license for federal courts to defer to ongoing state proceedings whenever a party seeks to litigate federal claims.   The Supreme Court in *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) clarified that *Younger* applies in only three categories of state proceedings: (1) state criminal prosecutions, (2) civil enforcement proceedings akin to a criminal prosecution, and (3) civil proceedings involving orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions. Even when a proceeding fits within one of these categories, abstention is not automatic — it requires that the federal plaintiff have an adequate opportunity to raise constitutional claims on an interlocutory basis in the state forum, *Middlesex*, 457 U.S. at 432, is subject to other exceptions, and requires that certain threshold factors are met.   The Second Circuit has confirmed that even in attorney discipline cases, which may implicate *Sprint*'s second category, the exceptions that *Younger* itself recognized — including bad faith, harassment, and inadequacy of the state forum — must be applied with full rigor. *Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191, 198-199 (2d Cir. 2002). Each of those exceptions is met here.

## I.   IT IS PREMATURE TO CONSIDER GRANTING THE MOTION TO DISMISS WITHOUT THE BENEFIT OF LIMITED DISCOVERY.

"[W]hen there are factual disputes about whether a *Younger* exception applies, the district court should hold an evidentiary hearing," *Miller v. Sutton*, No. 3:15-cv-1111, 2016 U.S. Dist. LEXIS 95475 *70 (D. Conn. July 21, 2016) citing *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003). Prior to such a hearing, limited discovery should be allowed for four independent reasons.  *First,*

limited discovery is separately warranted to resolve the threshold jurisdictional question of whether the bad faith exception to *Younger* abstention applies. Whether this Court exercises jurisdiction at all turns in part on that question, and the factual record bearing on it is held exclusively by Defendants. The Second Circuit has defined the bad faith exception as applying where the state proceeding was initiated with and is animated by "a retaliatory, harassing, or other illegitimate motive," or where the proceeding was brought without a reasonable expectation of obtaining a valid adverse determination. *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198-199 (2d Cir. 2002) (internal quotations and citations omitted). The bad faith exception also encompasses proceedings brought for retaliatory purposes — specifically to punish, deter, or suppress constitutionally protected advocacy activity. *Id.* The bad faith question is not purely a legal question that can be resolved on the face of the charging papers. It is a factual inquiry into what Defendant Hanley knew, what he disclosed, what he omitted, and what purpose animated the decision to bring these specific charges against Plaintiff at this particular time.

*Second*, as argued at length below, each of the nine rules invoked across the eight counts is a content-based speech restriction that is *presumptively invalid* under the First Amendment. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Once a rule is shown to be presumptively invalid, *Dombrowski v. Pfister*, 380 U.S. 479 (1965), renders abstention in favor of proceedings conducted under that rule purposeless. As Stanford Professor Fred O. Smith has explained, the *Younger* doctrine — properly understood in its historical context — was never designed to compel deference to state proceedings that are themselves the vehicle for constitutional injury. Fred O. Smith Jr., *Younger and Older Abstention*, 123 MICH. L. REV. 1449, 1459 (2025). Where the prosecution or proceeding is grounded on a facially overbroad rule that sweeps across constitutionally protected speech, the state proceeding cannot cure the injury no matter how conscientiously it is conducted. Abstaining in that circumstance insulates unconstitutional rule-making from review — the precise opposite of what the First Amendment, *Dombrowski*, and *Younger* itself require.

*Third*, Defendants have made no attempt to satisfy their burden under strict scrutiny. A

content-based restriction is presumptively invalid, and the burden falls on the government to demonstrate that the restriction serves a compelling governmental interest and is narrowly tailored to achieve that interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000). The Motion to Dismiss rests entirely on *Younger* abstention; it does not argue that any of the nine challenged rules survives strict scrutiny, does not identify any compelling governmental interest served by any rule as applied to Plaintiff's petitioning activity, and does not address narrow tailoring at all. The Complaint specifically alleges that none of the nine rules serves a compelling governmental interest as applied to Plaintiff's advocacy and that none is narrowly tailored. ECF 1 ¶¶ 85, 106, 109-113, 121-123, 130-132, 141-143, 152-154, 163-165, 174-177, 186-188, 195-197 Under *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), those unchallenged well-pleaded allegations are accepted as true for purposes of this motion. Abstaining to permit proceedings under rules that are, on this record, presumptively unconstitutional and wholly undefended under the applicable First Amendment standard serves none of *Younger*'s legitimate purposes.

*Fourth,* even if Defendants were to attempt to satisfy their strict scrutiny burden on a future filing, the factual record bearing on that inquiry is entirely in their possession. What compelling governmental interest does Defendants claim justifies applying Rule 8.4(d) to RICO allegations filed with a regulatory tribunal? What evidence of narrow tailoring supports a rule with no definition, no scienter requirement, and no safe harbor for protected petitioning? How does Rule 4.5's blanket prohibition on criminal threats differ from the overbroad predecessor rule the ABA itself eliminated in 1983? Those factual questions cannot be answered from the pleadings alone. As set forth in Plaintiff's separately to be filed Motion for Limited Expedited Discovery, targeted discovery is necessary before this Court can properly evaluate whether the vital-state-interest prong of *Middlesex* is satisfied,[6] as well as other factors. Proceeding to a ruling on abstention without that record would require this Court to defer to proceedings under presumptively unconstitutional rules — conducted by a structurally compromised tribunal — based solely on Defendants' invocation of a generalized interest in attorney discipline that the Supreme Court has

---

[6] In *Middlesex* itself, the district court held two days of hearings. 457 U.S. at 429.

10

never held sufficient to satisfy the vital-interest prong on its own, or on its own justify abstention.

## II.    THE VITAL STATE INTEREST PRONG OF *YOUNGER* IS NOT SATISFIED BECAUSE A STATE HAS NO VITAL INTEREST IN UNCONSTITUTIONALLY REGULATING SPEECH.

Even before reaching the bad faith, inadequate forum, facial challenge and other exceptions addressed below, this Court should hold that *Younger* abstention is unavailable on the more fundamental ground that the second *Middlesex* prerequisite — that the state proceedings involve a vital state interest — is not met as to the specific charges brought here. *Middlesex* held that abstention is only appropriate "[w]here vital state interests are involved." 457 U.S. at 432. The question is not whether the State has any interest in attorney discipline as an abstract matter. The question is whether the State has a vital interest in *these specific charges* brought against *this specific conduct*. On that question, the answer is no.

Vermont unquestionably has a legitimate interest in regulating attorneys' practice before Vermont State courts. But a legitimate interest — and even a significant interest — is not the same as a *vital* interest capable of justifying abstention from federal constitutional review. The Supreme Court has never held that every exercise of a state's disciplinary authority automatically satisfies the vital-interest prong. To the contrary, *Middlesex* itself required that the interest be evaluated in relation to the specific proceeding at issue, not the regulatory scheme in the abstract. Where the specific charges target constitutionally immunized conduct, there is no legitimate state interest — let alone a vital one — in prosecuting them in a State tribunal, such as the PRB. A state cannot have a vital interest in doing what the Constitution forbids it to do.

The eight counts of the Petition rest entirely on content-based restrictions targeting Plaintiff's advocacy speech and petitioning activity. None of those VRPC content-based restrictions pass *Gentile's* equivalency of the Holmes' "clear and present danger" test.  Every count charges Plaintiff with a violation arising from the content, tone, or subject matter of statements he made in governmental and judicial proceedings — filings with the PUC, testimony before the PUC, communications with legislators and elected Town officials, and appeals to the Vermont courts. This is precisely the category of speech that *Becerra*, 138 S. Ct. at 2371–72 (2018), protects

11

without diminution, and that *Noerr-Pennington* immunizes from liability entirely.

Where all eight counts of a disciplinary petition target absolutely privileged petitioning activity — activity that a state may not sanction under any circumstances — applying the vital-interest prong of *Younger* as though the state's general regulatory interest in attorney conduct automatically satisfies that prong would create a constitutional loophole of the first order: any state could immunize unconstitutional content-based speech restrictions from federal judicial review merely by embedding them in a professional discipline framework. The First Amendment does not permit that result, and *Younger* does not require it.

The point is sharpest at the level of the specific rules invoked. Rules 3.1, 3.3(a)(1), 3.5(b)(1), 3.5(d), 4.2, 4.4(a), 4.5, and 8.4(d) — which together form the basis for Petition's eight counts — are content-based restrictions. They do not regulate what lawyers *do*; they regulate what lawyers *say*. Rule 8.4(d)'s prohibition on "conduct prejudicial to the administration of justice" contains no limiting principle and no definition of the prohibited content; it is standardless content-based regulation that the Supreme Court would subject to strict scrutiny if applied outside the bar discipline context. *Gentile*, 501 U.S. at 1075–76 (striking down attorney speech regulation as impermissibly vague). Vermont's interest in enforcing vague, content-based speech rules against protected advocacy is not a vital state interest. It is, at most, a regulatory preference for silencing disfavored speech — and a state has no cognizable interest, let alone a vital one, in suppressing speech that the First Amendment places beyond its reach.

This conclusion follows directly from the Supreme Court's most recent pronouncement on the subject. In *First Choice*, the unanimous Court reaffirmed that the government "could channel the ability of disfavored groups to associate through narrow and state-preferred forms," thereby "marginalizing dissident voices," if federal courts defer to government actors who use facially neutral regulatory mechanisms to accomplish what the First Amendment directly prohibits. Slip op. at 19–20. A state's interest in regulating attorneys generally cannot provide cover for content-based suppression of protected advocacy. The vital-interest prong of *Younger* must be evaluated charge by charge and rule by rule — and evaluated against the actual speech and conduct at issue,

12

not the abstract category in which the State has chosen to place it. When that charge-specific inquiry is conducted here, it reveals that Vermont has no vital interest in any of the eight counts: each rests on protected petitioning activity that Vermont may not constitutionally sanction regardless of the vehicle it chooses to employ.

### III.    *DOMBROWSKI* **REQUIRES THE DENIAL OF ABSTENTION**.

*Dombrowski* is the Supreme Court's most important pre-*Younger* precedent on the relationship between facially overbroad state laws and federal equitable intervention, and it controls this case. In *Dombrowski*, the Supreme Court held that a federal court could enjoin Louisiana from prosecuting civil rights organizations under state statutes it found facially overbroad, without requiring the organizations to exhaust their defenses in the ongoing state prosecution. The Court's reasoning rested on two propositions that map directly onto the claims here. *First*, where a statute is facially overbroad — where it reaches substantially protected speech in addition to any unprotected conduct it might legitimately address — "the threat of sanctions may deter" protected activity just "as potently as the actual application," 380 U.S. at 486 (internal citations and quotations omitted). The injury is the statute itself, not any particular enforcement action. *Second*, requiring the plaintiff to litigate the facial challenge in the state proceeding does not cure this injury, because the chilling effect continues throughout the litigation and the state forum cannot deliver the relief sought — invalidation of the overbroad statute. *Id.* at 489–90.

Both propositions apply here with full force. The nine rules invoked in the Petition — analyzed at length below — are each presumptively invalid and facially overbroad: they reach substantially into protected petitioning activity that Vermont has no constitutional authority to sanction. Rule 8.4(d)'s undefined "prejudicial to the administration of justice" standard, Rule 3.5(d)'s prohibition on "undignified" advocacy, Rule 4.5's blanket restriction on criminal threats (which the ABA itself determined was overbroad in 1983), and the other challenged rules all sweep across the core of First Amendment protection. As in *Dombrowski*, the threat of discipline under these rules chills Plaintiff's ongoing regulatory advocacy — his PUC filings, his communications with elected officials, his challenges to government conduct — regardless of whether the PRB

proceeding ultimately results in discipline. ECF 1 ¶¶ 33– 40. That chilling effect is the substantial and grave constitutional injury, and it is present now.

*Younger* abstention in the face of a *Dombrowski* claim does not preserve the state proceeding's integrity—it ratifies the substantial and grave constitutional injury. The reason is structural: the *Younger* doctrine presupposes a legitimate state proceeding whose proper completion will vindicate the plaintiff's rights if they are meritorious. That presupposition fails when the proceeding is itself grounded on a facially overbroad rule that no state court can save by narrow construction, because the overbreadth infects the rule on its face and the chilling effect is independent of outcome. This Court cannot defer to the PRB proceeding as an adequate vehicle for adjudicating Plaintiff's facial challenges because the PRB has no authority to invalidate Vermont's bar rules and the Vermont Supreme Court—which does have that authority—has twice declined to provide review. *Dombrowski* requires this Court to exercise its jurisdiction.

The lower courts' expansive application of *Younger* — what Professor Smith calls "free-floating federalism" that diverges from the Supreme Court's careful balance between comity and individual rights — is precisely the dynamic at work in Defendants' motion. Smith, 123 MICH. L. REV. at 1451. Defendants invoke *Younger* as a blanket shield against federal review of a proceeding that targets constitutionally immunized advocacy, was initiated by a litigation adversary with direct financial interests in Plaintiff's removal, and is being adjudicated by a structurally compromised tribunal whose appointment was void *ab initio*. *Dombrowski* and the historical equitable tradition that Smith's article recovers both answer that invocation the same way: where irreparable constitutional harm cannot be cured by completing the state proceeding, the federal court must exercise its jurisdiction. Here, the irreparable harm is ongoing, the state forum cannot provide the relief sought, and the rules at issue are presumptively unconstitutional. *Dombrowski* requires the denial of abstention.

## IV.   *YOUNGER* ABSTENTION IS INAPPLICABLE WHEN IT ELIMINATES RATHER THAN PRESERVE'S THE ROLE OF A JURY.

In *Younger*, "[t]he Court emphasized the importance of restraining equity jurisdiction to

14

preserve the jury's role." Fred O. Smith Jr., *Younger and Older Abstention*, 123 MICH. L. REV. 1449, 1460 (2025).[7]  The historical origins of *Younger* abstention — which Professor Smith's article meticulously recovers from centuries of equitable practice — confirm that the doctrine was designed to serve the jury's institutional role, not to extinguish it. Courts of equity traditionally declined to intervene in ongoing legal proceedings in part to preserve the jury's fact-finding function; injunctions were granted in equity precisely when the legal remedy (the jury trial) was inadequate to address the harm. Smith, 123 MICH. L. REV. at 1460. The *Younger* Court's emphasis on restraining equity jurisdiction was thus an expression of respect for the jury's role — not a mechanism for denying jury rights altogether. When abstention in favor of an administrative tribunal eliminates the plaintiff's right to a jury trial, it inverts the doctrine's historical purpose. A court that abstains in such a case is not preserving the jury's role; it is extinguishing it.

This case presents exactly that inversion. The PRB is an administrative tribunal. It does not and cannot empanel a civil jury. If this Court abstains in favor of the PRB proceeding, Plaintiff's Seventh Amendment right is not deferred — it is destroyed. There is no mechanism by which the PRB can provide a civil jury, and there is no route by which a final PRB decision can be reviewed by a federal jury on the merits. Abstention under *Younger* in this posture would accomplish precisely what the Seventh Amendment forbids: routing the adjudication to a tribunal that lacks any jury component.

Here the Defendants seek to take away Plaintiff's property, his right to practice law.  "The Seventh Amendment's jury-trial right does not work alone. It operates together with Article III and the Due Process Clause of the Fifth Amendment to limit how the government may go about depriving an individual of life, liberty, or property. The Seventh Amendment guarantees the right to trial by jury." *SEC v. Jarkesy*, 603 U.S. 109, 141 (2024) (Gorsuch, J., concurring.)  The absence of a civil-jury guarantee in the Constitution was among the Antifederalists' chief objections as they concurred with Blackstone that the right was a critical check on abuses of power by tribunals of all stripes. *"[E]very new tribunal erected for the decision of facts, without the intervention of a*

---

[7] Available at: https://repository.law.umich.edu/mlr/vol123/iss8/3.

*jury ... is a step towards establishing aristocracy.*" 3 Blackstone, *Commentaries on the Laws of England* (1780) at pages 379-381. John Adams captured that mood, declaring that "the most cruel" and "unjust Innovation" of the Stamp Act was "the alarming Extension of the Powers of Courts of Admiralty… In these Courts, one Judge alone, presides. No Juries, have any Concern there." *Letter from John Adams to Ebenezer Thayer* (Sept. 24, 1765), bit.ly/3zl0Ezn (last visited May 2, 2026).

The Supreme Court's decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), makes this point unavoidable. *Jarkesy* held that the Seventh Amendment right to jury trial prevents the government from routing an adjudication to an in-house administrative tribunal that would deprive a person of his property. The principle of *Jarkesy* and the principle of the equitable-jury-preservation rationale that Smith identifies in *Younger*'s history converge on the same conclusion: when abstention in favor of a non-jury administrative tribunal eliminates the right to a federal jury, *Younger* is not merely being applied broadly — it is being weaponized against the constitutional guarantee it was designed to protect.

The loss of a federal jury right on 1983 claims arising from constitutional violations is irreparable harm of the highest order. Once the PRB proceeding concludes — with or without a finding of misconduct — the Seventh Amendment injury cannot be remedied retroactively. No subsequent federal proceeding can provide the jury that the PRB proceeding denied. *Younger* abstention, properly understood in its historical context, does not permit federal courts to defer to state administrative proceedings that inflict this kind of irreversible constitutional harm. The doctrine was designed to avoid unnecessary friction between federal and state courts, not to authorize federal courts to surrender constitutional rights on the altar of federalism. This Court should deny abstention, exercise its jurisdiction, and preserve Plaintiff's right to the federal civil jury that the Seventh Amendment guarantees.

## V.    THE BAD FAITH AND RELATED EXCEPTIONS DEFEAT *YOUNGER* ABSTENTION.

*Younger* abstention is unavailable where the state proceeding was initiated with bad faith or harassment. In the Second Circuit, the bad faith exception is met when a state proceeding is

16

brought "without a reasonable expectation of obtaining a valid conviction" — or, in the disciplinary context, a valid sanction — "or solely to harass the federal plaintiff." *Diamond "D"*, 282 F.3d at 198-199. The exception extends to proceedings initiated or maintained with an improper retaliatory purpose or to deter protected speech. *Id*. The record here satisfies that standard many times over.

### A.  Hanley Admitted on the Record That He Lacked Probable Cause for the Lead Count.

At the January 30, 2026 meet-and-confer conference in PRB Case 120-2025, Plaintiff asked Hanley directly how he could justify bringing and maintaining Count I — which charges that Plaintiff's PUC filings alleging a Town Plan cover-up and civil RICO violations were false statements — in light of the substantial evidence establishing the Town Plan's expiration. Hanley's response was candid: it was his opinion that civil RICO applies only to "mobsters," and the officials of the Town of Bennington are not "mobsters." ECF 1 ¶62.

That admission establishes bad faith on its own. Hanley's theory of Count I is that Plaintiff's PUC statements were false because Plaintiff never filed a RICO lawsuit against the Town. But the Second Circuit has squarely held that a municipality and its officials can be liable under civil RICO, *Gingras v. Think Fin., Inc*., 922 F.3d 112, 124-25 (2d Cir. 2019), and that stating that a party is preparing a civil RICO complaint is not a threat to report criminal violations at all, *Revson v. Cinque & Cinque*, 221 F.3d 71, 81 (2d Cir. 2000). Hanley never disclosed either of these controlling authorities to the probable cause panel. A charge that cannot survive the controlling legal standards of the Circuit in which it is brought is a charge without a reasonable expectation of obtaining a valid sanction, and its maintenance after the charging official acknowledged on the record that his theory is legally baseless confirms bad faith, preventing *Younger* abstention.

### B.  The Entire Evidentiary Basis of the Petition Is Immunized by *Noerr-Pennington*, and the Petition Does Not and Cannot Allege Sham Litigation.

All eight counts of the Petition are based exclusively on documents Plaintiff filed with, or sent to, governmental entities. The *Noerr-Pennington* doctrine immunizes "all petitioning activity," including "concerted efforts incident to litigation, such as pre-litigation threat letters and

17

settlement offers." *PrimeTime 24 Joint Venture v. Nat'l Broad. Co*., 219 F.3d 92, 100 (2d Cir. 2000). Counts I, III, IV, V, VI, and VII target PUC filings, a legislative committee email, Environmental Division filings, and communications with elected Town officials. Count II targets emails sent in the course of PUC proceedings. Count VIII targets the cumulative pattern of those same petitioning activities.

The only exception to *Noerr-Pennington* immunity is "sham litigation" — petitioning activity that is both "objectively baseless" and "intended to cause harm through the use of the governmental process." *T.F.T.F. Cap. Corp. v. Marcus Dairy, Inc*., 312 F.3d 90, 93 (2d Cir. 2002). The Petition does not allege — and could not in good faith allege — that any of Plaintiff's litigation activity constitutes sham litigation. The absence of any sham allegation is itself telling: Hanley knows that Plaintiff's PUC and court filings are substantiated, that the Town Plan did expire, and that Plaintiff had genuine grounds for every proceeding. The failure to plead sham litigation is a fatal gap in the Petition that forecloses any legitimate purpose for the proceeding, rendering it bad faith from inception.

**C. The Chain of Conflicted Appointments Establishes Bad Faith and Retaliatory Motive**.

The appointment chain running from Bent's complaint to Hanley's selection establishes bad faith and retaliatory purpose. ECF 1 ¶43. Bent filed the complaint while actively litigating against Plaintiff in PUC proceedings, immediately after Plaintiff's January 2025 filings exposed alleged malfeasance by the Town and Bent's firm's potential role in the malfeasance. ECF 1 ¶¶ 2, 16. Jon Alexander recused himself because he reports directly to Bent as Special Counsel to the JCB. ECF 1 ¶ 21. The referral was then made to Anderson, whose personal email was copied on the Alexander recusal email. Anderson, who has since recused herself because of conflicts, see ECF 24-7, nevertheless purportedly appointed Hanley. ECF 1 ¶¶21–22. Hanley, Bent's former PRB colleague and former PRB Chair who now represents solar developers competing with Plaintiff's projects, accepted the appointment despite those conflicts. ECF 1 ¶23.

Each step in this chain is independently disqualifying. The combined effect — an appointment engineered by the adversary through her own direct subordinate to an officer with

direct financial stakes in harming the target — is paradigmatic bad faith and harassment. *See* ECF 1 ¶¶ 26-48.

### D. Hanley's February 11, 2026 Filing Threatened Additional Charges as Punishment for Exercising the Right to Defend.

On February 11, 2026, Hanley filed a memorandum in which he characterized Plaintiff's exercise of his procedural rights — filing motions to dismiss, seeking interlocutory review, issuing subpoenas — as having "obstructed these proceedings" and stated that Plaintiff had "blatantly violated his obligation to cooperate with the disciplinary process." ECF 1 ¶ 34.  A charging official who threatens adverse consequences for the exercise of constitutionally protected procedural rights is precisely the bad faith actor that *Diamond "D"* contemplates. The threat to use a party's defensive litigation as evidence of further misconduct — when that litigation consists entirely of First Amendment petitioning activity before courts and administrative bodies — is itself a First Amendment violation and confirms that the proceeding's purpose is to punish, not to regulate.

### E. Screening Counsel's Referral Was Limited to Two Rules; Hanley Brought Eight Counts.

Screening Counsel Strauss, after reviewing the Bent complaint, referred the matter to Alexander identifying potential violations of only Rule 4.2 and Rule 3.1 as "the most clear." He expressly noted that "Attorney Bent makes other claims of Rule violations, but I find the ones above are the most clear." ECF 24-1. Hanley charged eight counts spanning nine separate rules. ECF 1 ¶ 28. The unauthorized expansion of the scope of the investigation beyond what Screening Counsel found supported is independent evidence of bad faith — Hanley was not implementing the Screening Counsel's referral but weaponizing it.

### F. Count II Had No Legitimate Purpose — Criminal Prosecution Was Legally Impossible Before the Conduct at Issue Occurred.

Count II charges Plaintiff with violating Rule 4.5 by allegedly threatening criminal prosecution against ML and DG in connection with a May 3, 2024 email. But the ML/DG bankruptcy discharge was entered on April 11, 2018. Under 18 U.S.C. § 3282, the statute of limitations for any bankruptcy-related criminal charge expired on April 11, 2023 — more than one

19

year before the May 3, 2024 email. At the time of the email, criminal prosecution was legally impossible, a fact Plaintiff confirmed to ML/DG's attorney at the time. ECF 1 ¶ 63. Hanley never disclosed this to the probable cause panel.  A disciplinary count predicated on threatening a criminal prosecution that could not legally occur when the alleged threat was made has no cognizable legitimate purpose. It is, by definition, a count without a reasonable expectation of obtaining a valid sanction.

### G. Count V Is Self-Defeating on Its Own Terms.

Count V charges Plaintiff with bringing frivolous proceedings in the Environmental Division in connection with the Benn High project. But the Environmental Division's own February 28, 2025 entry order stated that "the court believes it lacks subject matter jurisdiction over this appeal and is prepared to dismiss the appeal *sua sponte*" — yet simultaneously gave PLH until March 3, 2025 to respond. The court itself was uncertain about jurisdiction and invited briefing. A charge of frivolous litigation premised on filing a proceeding that the court itself was uncertain it could dismiss is internally incoherent and lacks any reasonable expectation of a valid sanction.

### H. The Probable Cause Affidavit Was Facially Deficient and Fraudulently Presented.

Hanley's probable cause affidavit consisted of eleven paragraphs of which only paragraph 11 purported to contain facts, and those "facts" consisted solely of Hanley's statement that he "expected to prove" violations — with no supporting documents, no count-by-count analysis, and no disclosure of controlling contrary authority. ECF 1-5. The Vermont Supreme Court has held that probable cause requires "a state of facts and circumstances as would lead a careful and conscientious man to believe" that a violation occurred. *Diamond v. Vickrey*, 134 Vt. 585, 590 (1976). Probable cause must be established count by count. *Chiaverini*, 602 U.S. at 562-63.

Hanley also failed to disclose to the probable cause panel: (1) that civil RICO applies to municipalities in the Second Circuit; (2) that announcing a civil RICO complaint is not a threat to present criminal charges under Second Circuit precedent; (3) that the entire evidentiary basis is *Noerr-Pennington* immunized; (4) that the statute of limitations on Count II had expired before

20

the conduct at issue; and (5) that the "not credible" PUC remark in Count III was a statutory agricultural classification ruling — the PUC applied Vermont's definition of a farm from the viewpoint of 30 V.S.A. §248 and concluded Plaintiff's land use did not qualify under Vermont's agricultural statute — not a finding that Plaintiff's testimony was factually false; a regulatory body's disagreement with a witness's characterization of his own activity under an agricultural statute cannot supply the knowing-falsity element that Rule 3.3(a)(1) requires. These omissions, each independently material, collectively establish judicial deception. *Scanlon v. Cty. of L.A.*, 92 F.4th 781, 799 (9th Cir. 2024).

Hanley lacked probable cause for each charge. Hanley had no reasonable chance of a positive outcome for any charge either. ECF 1 ¶¶62-76. Defendants do not dispute Plaintiff's well-pleaded and supported allegations, *id*., thus forfeiting their claim to *Younger* abstention.

## I.    Defendants' Professional-Discipline Authorities Are Materially Distinguishable.

Defendants marshal a roster of cases — *Rosellini, Roshan, Wassef, Igbanugo, Klayman, Spargo, Anonymous, Miller*, and this Court's own *Kennedy v. Rockwell* — and present them as though they compel abstention. They do not. Every case on that list shares two features that are absent here. *First*, the disciplinary predicate in each was plainly unprotected misconduct — misappropriation of client funds, fraud on clients, client harassment, false statements to a tribunal about non-petitioning matters, disobedience of court orders, HIPAA violations, judicial campaign improprieties, or frivolous litigation filed to retaliate against opposing counsel. *Second*, the "bad faith" theory in each was confined to generalized allegations of political or racial animus, untethered to any concrete feature of the disciplinary charging papers or the evidence behind them. This case inverts both features. The disciplinary predicate is core petitioning activity — statements made in open judicial and administrative tribunals, the very conduct absolutely privileged under *Munster v. Lamb*, 11 Q.B.D. 588 (C.A. 1883), *Restatement (Second) of Torts* § 586 (1977), and the *Noerr-Pennington* doctrine. And the allegations of bad faith are anchored in documentable features of the Petition itself: Hanley's selective truncation of *In re Wright* to strip its financial-predation grounding; his failure to disclose to the probable cause panel the agricultural legal issue

21

— which knocks out the factual scaffolding for Count III's Rule 3.3(a)(1) charge; and the inversion of *Scanlon*'s material-disclosure rule. Defendants' cases are therefore not merely distinguishable; they are inapposite on the two axes the *Diamond "D"* inquiry turns on.

*Rosellini v. Wilcox*, No. 22-2610, 2025 WL 401206 (3d Cir. Feb. 5, 2025), involved a New Jersey attorney disciplined under RPC 3.4(c) and 8.4(d) for refusing to pay court-ordered sanctions — conduct no advocacy privilege or *Noerr-Pennington* doctrine has ever reached. An attorney is not privileged to disobey a court order, and the Third Circuit therefore never had occasion to consider whether absolutely-privileged petitioning speech can ground a disciplinary charge. The Petition here charges that Plaintiff's statements to tribunals, made in petitioning posture, were false or misleading — and it is precisely that predicate that collapses under *Munster*, § 586, and *Noerr-Pennington*.

*Roshan v. McCauley*, 130 F.4th 780 (9th Cir. 2025), is not an attorney-discipline case. It concerned a California Department of Real Estate proceeding to suspend the plaintiff's real estate license after his law license had already been suspended for unrelated misconduct. Nothing in *Roshan* addresses whether *Younger* permits abstention where the predicate for discipline is itself protected speech. Different profession, different legal theory, different sovereign.

*Wassef v. Tibben*, 68 F.4th 1083 (8th Cir. 2023), involved an Iowa physician charged with HIPAA violations—unauthorized access to patient records. His theory was federal preemption, *i.e.*, that only the United States Department of Health and Human Services, not the State regulatory authority could sanction him. *Wassef* did not involve First Amendment petitioning immunity. The disclosure of protected patient health information is not advocacy speech. *Wassef* says nothing about whether a disciplinary proceeding predicated on constitutionally absolutely-privileged advocacy can support abstention.

*Igbanugo v. Minnesota OLPR*, 56 F.4th 561 (8th Cir. 2022), is a particularly poor fit. Three of Igbanugo's past clients won a jury verdict against Igbanugo on malpractice and related breach-of-contract and fraud claims in 2017. Afterward an ethics complaint was filed against Igbanugo to the Minnesota Office of Lawyers Professional Responsibility, reporting the same misconduct

allegations at issue in the suit that Igbanugo lost. After investigation Igbanugo was charged with "failing to act with diligence, failing to notify clients of important updates, failing to properly explain legal issues to clients, collecting unreasonable fees (including availability fees when he was already retained to perform legal services), failing to issue prompt refunds of unearned advanced fees, failing to refund unearned advanced fees, failing to take reasonable steps to make sure the firm had measures to ensure all lawyers and non-lawyers complied with professional obligations, and providing false and misleading information." *Igbanugo* says nothing about whether a disciplinary proceeding predicated on constitutionally absolutely-privileged advocacy can support abstention. *Igbanugo* involved paradigmatic common law disciplinary offenses.

*Klayman v. Fox*, 2019 WL 2396538 (D.D.C. June 5, 2019), is the closest of the cited cases, but its distance from this one remains substantial. Klayman faced three separate disciplinary matters: (i) a conflict-of-interest charge for representing clients adverse to his former organization; (ii) an extended pattern of obsessive romantic advances, stating that he would charge a higher fee if the client rebuffed his romantic advances, failure to enter into a written fee agreement, failure to withdraw from the case after being terminated by the client and publishing eleven articles about the case in an online periodical without the client's consent; and (iii) misrepresentations to courts regarding his petition for pro hac vice admission to the District of Nevada. None of that predicate conduct was arguably petitioning or arguably covered by the advocacy privilege. No comparable factual nucleus existed in *Klayman*.

*Spargo v. New York State Commission on Judicial Conduct*, 351 F.3d 65 (2d Cir. 2003), is a judicial-discipline case, not an attorney-discipline case. Spargo faced five counts of judicial misconduct. Charge I related to him "offering items of value such as cider and donuts to induce voters to vote for him during his campaign for Town Justice." Charge II involved him "accepting the Albany County District Attorney-Elect as a client in connection with the contested election for District Attorney, notwithstanding the fact that the District Attorney's office regularly appeared in criminal cases before Spargo as a sitting Town Justice," and Spargo "presiding over criminal cases prosecuted by the Albany County District Attorney's Office without disclosing to defense counsel

that Spargo had previously represented the District Attorney and that the District Attorney's campaign committee still owed Spargo $ 10,000 in legal fees." Charges III and IV alleged that Spargo violated prohibitions on partisan political activity, including allegedly "participating in a loud and obstructive demonstration against the recount process outside the offices of the Miami-Dade County Board of Elections in an attempt to disrupt the recount process in the 2000 Presidential election. The fifth charge involved allegedly authorizing improper payments to two consultants involved in his campaign for Supreme Court Justice. Spargo was a Republican, and one $ 5,000 payment was made for "consulting services" purportedly rendered on October 30, 2001, the same day that the recipient nominated Spargo as the Democratic Party's candidate for Supreme Court Justice. The second $5,000 payment from his campaign committee was made "to Empire Strategy Consultants, the principal of which was the Rensselaer County Independence Party Chairman. The absolute-privilege defenses — *Munster*, § 586, *Noerr-Pennington* — were not implicated and not addressed in *Spargo*. Its rationale therefore does not port over.

Three of Defendants' remaining citations add nothing of independent weight. *Anonymous v. Association of the Bar*, 515 F.2d 427 (2d Cir. 1975), predates not only *Sprint* but also *Middlesex* and has been substantially recontoured by the Supreme Court's narrowing of *Younger* in the intervening half-century. Regardless, the central constitutional issue was an evidentiary one— could the grand jury testimony the attorney gave under transactional immunity be used against him in a disciplinary proceeding. None of the predicate conduct was arguably petitioning or arguably covered by the advocacy privilege.

In *Miller v. Sutton*, 2016 WL 3976540 (D. Conn. July 21, 2016), Miller filed a lawsuit alleging racial discrimination claims. Opposing counsel filed a motion for sanctions alleging that certain factual allegations in the complaint were knowingly false. After a hearing, Connecticut Superior Court Judge Meyer found that Miller's statements were knowingly false, granted the motion for sanctions, and fined Miller $1,500, and referred the Miller's conduct to the Connecticut attorney disciplinary authority, which found probable cause that Miller had violated the Rules of Professional Conduct by those knowingly false statements of fact in the original complaint and in

24

an amended complaint. Another Connecticut Superior Court judge referred a different matter regarding Miller. Judge Bellis's referral claimed that Miller had engaged in misconduct by refusing to make a client available for a deposition and misusing a caseflow request in the matter of *Mazzo v. Town of Fairfield*. A third proceeding was based on a referral by the *en banc* Connecticut Appellate Court. Miller's conduct is not comparable to Plaintiff's. *Sutton* is relevant here but not for the reasons Defendants seem to think. "[W]hen there are factual disputes about whether a *Younger* exception applies, the district court should hold an evidentiary hearing," *Miller v. Sutton*, No. 3:15-cv-1111 (MPS), 2016 U.S. Dist. LEXIS 95475 *70 (D. Conn. July 21, 2016) citing *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003). Limited discovery and an evidentiary hearing are required here.

*Kennedy v. Rockwell*, 2012 WL 3637237 (D. Vt. Aug. 21, 2012), is entirely irrelevant. The disciplinary complaint filed by the PRB there was removed to federal court by the attorney being charged, but the notice of removal was untimely. Thus, the court remanded the case. That basis ended the matter. The court, however, went on to discuss the fact that federal jurisdiction requires an affirmative assertion of federal matter in the complaint itself, which was lacking, independently justifying dismissal. The question of *Younger* was not addressed by the court.

The through-line of Defendants' string cite is plain: courts have abstained where the underlying misconduct is plainly unprotected and the plaintiff's bad-faith theory is conclusory. That pattern confirms rather than defeats Plaintiff's position. Remove unprotected misconduct and conclusory bad-faith allegations, and the case for abstention disappears. What remains is this case — a disciplinary Petition aimed directly at the exercise of the petition and free speech clause right, supported by documentable textual and evidentiary manipulations in the charging papers themselves, and shielded by no state-court guarantee that the absolute-privilege defenses will be adjudicated before the damage is done. Abstention on this record would not serve comity. It would underwrite a constitutional violation that *Noerr-Pennington*, *Munster*, and § 586 have each, in their respective domains, placed beyond the reach of government sanction.

25

## VI.   THE STATE FORUM IS CONSTITUTIONALLY INADEQUATE.

*Younger* abstention requires that the state forum provide an adequate opportunity to raise and adjudicate on an interlocutory basis the federal constitutional claims asserted in the federal complaint. *Middlesex*, 457 U.S. at 432. Where the state forum structurally cannot provide meaningful timely interlocutory constitutional review — whether because no interlocutory mechanism exists, because the forum is structurally compromised, or because the adjudicators have interests in the outcome — abstention is unavailable. The state forum here fails on every dimension.

### A. No Interlocutory Constitutional Review Exists — Established by Three Successive Orders.

In *Middlesex*, the Supreme Court emphasized that the New Jersey Supreme Court had affirmatively amended its rules to permit interlocutory review of constitutional challenges to attorney discipline proceedings. 457 U.S. at 436. In *Spargo*, the Second Circuit stated that the availability of such interlocutory review was a critical predicate to *Younger* abstention in attorney discipline cases. 351 F.3d at 77. And in *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136 (1st Cir. 2008), the First Circuit upheld a federal injunction of state proceedings specifically because no interlocutory avenue existed.

Vermont's PRB proceedings contain no interlocutory appellate mechanism whatsoever, ECF 1 ¶30, a point that the Defendants concede in their motion to dismiss. *See* ECF 23 at 7 (confirming that it is only "on appeal to the Supreme Court" that Plaintiff can bring his constitutional claims to that court. *Middlesex* confirms that abstention is prohibited in this circumstance.[8]

The Vermont Supreme Court itself confirmed the unavailability of interlocutory review on two separate occasions. On October 30, 2025, in Case No. 25-AP-366, it denied Plaintiff's first

---

[8] On January 5, 2026, the HP held that A.O. 9, Rule 13(E) allows only appeals from "final decisions" that "fully dispose of an entire proceeding." There is "no provision in Rule 5, in any of the other Rules of Appellate Procedure, or in the Rules of Civil Procedure which allows a party to seek an interlocutory appeal in a disciplinary proceeding." January 5, 2026 HP Order. This was confirmed by Hanley's own February 26, 2026 opposition to Plaintiff's stay motion, in which Hanley acknowledged that the Vermont Supreme Court had denied all of Plaintiff's interlocutory petitions.

petition for extraordinary relief in a one-sentence order without explanation. On February 6, 2026, in Case No. 26-AP-024, it denied Plaintiff's second petition, ruling only "assuming arguendo" that interlocutory appeals under V.R.A.P. 5(b) are available in PRB proceedings — expressly declining to confirm that any such mechanism exists. After two denials, the availability of any interlocutory constitutional review mechanism in PRB proceedings remains formally unconfirmed by the Vermont Supreme Court. Vermont has not done what New Jersey did in *Middlesex*. The state forum fails the *Middlesex/Spargo* adequacy test.

Plaintiff raised this precise argument — that the absence of interlocutory constitutional review defeats *Younger* abstention — in his January 20, 2026 petition to the Vermont Supreme Court, citing *Middlesex, Spargo, and Esso*. The Vermont Supreme Court denied the petition without engaging with these arguments. That silence is the answer. The condition that *Middlesex* requires — a state forum that has affirmatively provided for interlocutory constitutional review — is unmet.

### B. Anderson Invoked Quasi-Judicial Immunity to Block All Discovery of Her Own *Ex Parte* Communications.

Anderson, who engaged in *ex parte* communications with Hanley and HP Chair Brill that caused Brill's recusal, subsequently invoked quasi-judicial immunity through the Vermont Attorney General to resist document production about those very communications. *See Motion to Compel* (January 14, 2026); *AG Objection Letter* (December 30, 2025). Anderson's written objection, transmitted through the AG, asserted that "the communications of Chair Anderson with other Board members, with the PRB staff, or with disciplinary or conflict disciplinary counsel related to the PRB's exercise of its quasi-judicial function are privileged and immune from discovery." *AG Letter* at 2. The result is that the constitutional claim of structural bias cannot even be investigated in the state forum. The Chair who made the conflicted appointment claims immunity from the discovery needed to prove that bias — and the AG represents her in that claim even though the AG's statutory authority to represent judicial branch members is questionable. The state forum cannot be adequate when the very facts needed to establish a constitutional claim are

shielded from discovery within that forum. *See AG Motion to Quash* (March 12, 2026) (extending the same immunity claim to all hearing panel members, including the probable cause panel).

### C.   The Hearing Panel Has No Validly Appointed Chair — Its Actions Are Void *Ab Initio*.

On March 9, 2026, Vice-Chair Caryn Waxman purported to appoint Walter French as HP Chair pursuant to PRB Policy 22. *See* ECF 24-7. Policy 22 provides: "When bar counsel, disciplinary counsel, or any member of a hearing panel has a conflict or is otherwise disqualified or unable to serve, the Board Chair shall appoint an alternate." (Emphasis added.) A.O. 9 contains no authority for the Vice-Chair to exercise the Chair's appointment power when the Chair is conflicted. Unlike the Rules for Disciplinary Control of Judges, which expressly authorize the Vice-Chair to "assume the Chair's duties" when the Chair is disqualified, A.O. 9 has no such provision.  Waxman's appointment therefore exceeded her authority. Under *Collins v. Yellen*, 594 U.S. 220, 257-58 (2021), when a government actor exercises "power that the actor did not lawfully possess," his or her actions are "void." The Supreme Court has applied this principle to invalidate adjudicatory proceedings tainted by appointment defects. *See Lucia v. SEC*, 585 U.S. 237 (2018); *Ryder v. United States*, 515 U.S. 177 (1995). French's appointment is void, and his March 11, 2026 order purporting to deny Plaintiff's recusal motion of the remaining panel members is accordingly of no legal effect. A state forum in which the adjudicating panel has no validly constituted chair is not an adequate forum. There is literally no valid tribunal before which Plaintiff's constitutional claims could be adjudicated.

### D.   Structural Conflicts Permeate Every Level of the State Forum.

The inadequacy of the state forum is not confined to any single conflict but pervades the entire structure of the proceeding from complaint to appeal. Bent, the complainant, chairs the JCB and wields direct authority over Alexander, who made the initial recusal and effectively designated Anderson as the decision-maker. Anderson, the GMP-affiliated PRB Chair, appointed Hanley. Hanley has himself been sued for malicious prosecution and abuse of process, *Chalidze v. Hanley*, et al, Docket No. 77-1-05 Rdcv (Vt. Super. 2005) and was sued for making false statements in *Vermont League of Cities and Towns v. Lewellyn*, 197-4-16 Wrcv, while continuing to represent

28

other parties after becoming a defendant himself.

Ron Shems, Chair of the probable cause panel, participated in the determination despite representing Washington Electric Cooperative — an adverse party in the standard offer proceedings underlying all of the solar project counts — in matters that were part of Hanley's own bates-stamped evidence against Plaintiff. *See* ECF 24-4, 24-5. French's spouse is a probate judge; Karl Anderson — Carolyn Anderson's husband — was named Agent for Service of Process for French & French, PLLC just thirty days before French's appointment. ECF 24-8. French's first act was to deny recusal of Shriver and Bannon without disclosing his firm's relationship with Karl Anderson or that Shriver's firm represented French in litigation in this District. ECF 24, fn. 13. No neutral forum exists at any level of this proceeding. A forum in which the complainant controls the recusal chain, the charging official has financial conflicts, the probable cause panel chair represented adverse parties, and the current hearing chair was appointed by an unauthorized officer and has documented political bias against the respondent's public positions is not an adequate state forum.

### E. The Vermont Supreme Court Cannot Serve as a Neutral Appellate Forum.

Even if Plaintiff obtained a final adjudication in the PRB proceedings and appealed to the Vermont Supreme Court, that court is not a neutral forum for his federal claims. The Vermont Supreme Court created and administers the PRB through A.O. 9. Chief Justice Reiber signed the Administrative Appointment in September 2025 designating Carolyn Anderson as PRB Chair and Caryn Waxman as Vice-Chair — the act that set the entire conflicted appointment chain in motion. Chief Justice Reiber then signed both denials of interlocutory review (Case Nos. 25-AP-366 and 26-AP-024). The court that constituted the apparatus, denied all review during the proceeding, and will be asked to review the constitutionality of its own administrative orders is not an adequate forum for the federal constitutional claims at stake. *See generally Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Federalist No. 80* ("No man ought certainly to be a judge in his own cause.")

29

VII.    **THE FRAMERS VESTED FEDERAL COURTS WITH JURISDICTION OVER PRECISELY THIS CATEGORY OF DISPUTE, AND ABSTENTION WOULD REQUIRE THE VERMONT SUPREME COURT TO ADJUDICATE WHETHER ITS OWN RULES AND CONDUCT VIOLATE THE UNITED STATES CONSTITUTION.**

The inadequacy of the Vermont state forum is not merely a procedural deficiency. It reflects a structural constitutional reality that the Framers themselves diagnosed and Article III was designed to correct. In *Federalist No. 80*, Alexander Hamilton explained why the national courts must have jurisdiction over cases in which the home state's own tribunals cannot be presumed impartial:

> The reasonableness of the agency of the national courts in cases in which the State tribunals cannot be supposed to be impartial, speaks for itself. No man ought certainly to be a judge in his own cause, or in any cause in respect to which he has the least interest or bias. This principle has no inconsiderable weight in designating the federal courts as the proper tribunals for the determination of controversies between different States and their citizens. … it would be natural that the judges, as men, should feel a strong predilection to the claims of their own government.

*The Federalist* No. 80 (Alexander Hamilton). That observation was not rhetorical; it was the constitutional rationale for vesting the federal judicial power in Article III courts with life tenure, salary protection, and independence from state political structures. The Framers understood what Hamilton made explicit: a state's own courts cannot be trusted to adjudicate impartially when the state's own government, institutions, or officials are the defendant. That is this case precisely.

The structural bias in this case is not speculative; it is compounded at every level of the state forum Defendants ask this Court to defer to as discussed above. Hamilton's observation that state court judges "should feel a strong predilection to the claims of their own government" understates the degree of institutional entanglement present here, where the judiciary's own appointment machinery is implicated in the constitutional violations being challenged.

Chief Justice Marshall recognized the corollary to Hamilton's principle: a federal court cannot decline to exercise jurisdiction any more than it can usurp jurisdiction it does not have. "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). *Cohens* itself arose from Virginia's argument that its own courts were the appropriate forum to adjudicate whether its own

laws violated the federal Constitution — precisely the argument Defendants advance here. Marshall rejected that argument comprehensively, holding that the federal judicial power exists specifically to ensure that state law and state conduct are measured against the federal Constitution by tribunals that are not structurally aligned with the state being judged. The principle *Cohens* establishes is not merely that federal courts *may* hear such cases; it is that they *must*.

The practical implication of *Younger* abstention in this case is that this Court would defer to the Vermont Supreme Court to adjudicate whether Vermont's own professional conduct rules, Vermont's own PRB appointment procedures, and Vermont's own Chief Justice's conduct in signing the orders denying interlocutory relief violated the United States Constitution. That is precisely the structural conflict the Framers designed Article III to prevent. It strains credulity to suppose that the Vermont Supreme Court would volunteer a ruling that its own institutional conduct has been unlawful. The Vermont bar discipline apparatus being challenged here is not an entity distinct from the Vermont judiciary; it is the Vermont judiciary's own regulatory arm. Asking the Vermont Supreme Court to find a constitutional violation in PRB Case No. 120-2025 is asking it to find a constitutional violation in itself. That is not comity. It is capitulation to the structural dynamic Hamilton identified two centuries ago as the precise reason the federal courts exist.

The *Younger* doctrine rests on a foundational assumption: that the state forum in which relief is withheld is genuinely capable of adjudicating the federal constitutional claims fairly and fully. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). That assumption fails here as a matter of constitutional structure, not just procedural complaint. When the constitutional violations alleged are embedded in the appointment power and supervisory authority of the state's own highest court, there is no independent and impartial state forum to which this Court can defer. The federal forum is not merely preferable; under Hamilton's framework and Marshall's command, it is the only constitutionally available one. The motion to dismiss should be denied.

**VIII.    THE PRB FORUM CANNOT GRANT THE RELIEF THE FACIAL CONSTITUTIONAL CHALLENGES SEEK; THE *MIDDLESEX* ADEQUATE-OPPORTUNITY PRONG FAILS AS TO THOSE CLAIMS.**

Counts IX, X, and XI of the Complaint challenge VRPC 3.1, 3.3(a)(1), 3.5(d), 4.2, 4.3, 4.4(a), 4.5, 8.3(a), and 8.4(d) as facially unconstitutional under the First, Fifth, and Fourteenth Amendments. *Younger* abstention does not bar these claims for a reason that flows from *Middlesex*'s own logic rather than any categorical exception to it: the PRB proceeding structurally cannot provide the relief these counts seek, and the *Middlesex* adequate-opportunity prong therefore fails as to those claims on its own terms.

The PRB HP is not a court of law. It has no authority to invalidate Vermont's Rules of Professional Conduct or to declare them facially unconstitutional. At most, it can find that a rule was or was not violated in this proceeding. A state forum that cannot grant the relief requested does not provide an "adequate opportunity" to raise a federal constitutional claim within the meaning of *Middlesex*, 457 U.S. at 432. *Younger* abstention rests on the premise that the state proceeding can vindicate the federal plaintiff's rights if meritorious — but that premise is structurally false as to claims for facial invalidation, because the PRB has no power to invalidate the bar rules no matter how meritorious those claims are. Deferring the facial challenges to the PRB does not provide Plaintiff an opportunity to raise them; it eliminates that opportunity entirely.

This conclusion follows from *Middlesex*'s own reasoning. The *Middlesex* Court abstained specifically because New Jersey's Supreme Court had confirmed that constitutional challenges could be raised and adjudicated on an interlocutory basis within the disciplinary proceedings themselves — that the state forum was capable of granting meaningful relief. 457 U.S. at 435–36. The Court's entire adequate-opportunity analysis assumed a forum capable of providing the interlocutory relief sought. No such assumption holds for facial claims before the PRB. Vermont's disciplinary system provides no pathway — no appellate mechanism, no referral procedure, no transfer to the Vermont Supreme Court — by which a PRB respondent can obtain a ruling on the facial constitutionality of the bar rules themselves during the pendency of the disciplinary proceeding. As set forth above, the Vermont Supreme Court has declined to provide interlocutory

32

review twice without analysis even though the Plaintiff specifically argued to the Vermont Supreme Court that the failure to provide interlocutory review would prevent *Younger* abstention. The Vermont Supreme Court is also not a neutral forum for challenges to rules it promulgates and administers, as discussed above. The facial constitutional claims have no adequate state forum. This Court is the only forum that can adjudicate them.

## IX. RULE-BY-RULE ANALYSIS: EACH CHALLENGED RULE IS A PRESUMPTIVELY INVALID CONTENT-BASED SPEECH RESTRICTION THAT CANNOT SURVIVE FIRST AMENDMENT STRICT SCRUTINY.

The framework for analyzing each challenged rule is the same. First, the rule regulates speech. Second, because it regulates speech based on its content or viewpoint, it is a content-based restriction and therefore presumptively invalid. Third, to survive the presumption of invalidity, the rule must pass First Amendment strict scrutiny. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017). Fourth, the burden is on Defendants to demonstrate a compelling governmental interest served by the restriction and that the restriction is narrowly tailored to achieve that interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). A generalized invocation of the state's interest in attorney discipline is insufficient — the interest must be compelling as to the specific speech being regulated and the specific rule being applied. Fifth, Defendants have not challenged the Complaint's allegations that no compelling governmental interest supports any of the charged rules and that none is narrowly tailored. Those uncontested allegations independently preclude abstention. Sixth, even if Defendants could identify a compelling interest, the rules are facially invalid because each sweeps in substantial constitutionally protected speech without adequate limiting principles. The analysis follows rule by rule.

### A. Rule 8.4(d) — "Conduct Prejudicial to the Administration of Justice" (All Eight Counts)

**Step 1 — The rule regulates speech.** Rule 8.4(d) appears in all eight counts. In every count it is applied to written filings, oral testimony, or communications — all speech acts. No non-speech conduct is charged under Rule 8.4(d) anywhere in the Petition.

33

**Step 2 — Content-based and viewpoint-based.**  The rule restricts speech based entirely on its content — whether it is "prejudicial to the administration of justice" — a standardless phrase that has no meaning independent of the tribunal's assessment of the speaker's viewpoint. Applied here, it targets the viewpoint of Plaintiff's advocacy: RICO allegations against government officials, litigation-related communications, PUC testimony, regulatory correspondence, jurisdictional arguments, responses to a complainant, communications with town officials, and their cumulative pattern. Every application is content- and viewpoint-based.

**Step 3 — Presumptively invalid.**  Content-based speech restrictions are presumptively unconstitutional. *Reed*, 576 U.S. at 163. The vagueness of "prejudicial to the administration of justice" compounds the presumption: no person of ordinary intelligence can know in advance whether filing RICO allegations against a municipality, emailing a regulatory chairman, or communicating with town officials about a pending disciplinary matter will be deemed "prejudicial." *Gentile*, 501 U.S. at 1075–76.

**Step 4 — Must survive strict scrutiny.**  Defendants must demonstrate a compelling governmental interest served by Rule 8.4(d) as applied to each specific application charged, and narrow tailoring. *Iancu*, 139 S. Ct. at 2299; *Matal*, 137 S. Ct. at 1763. They have made no showing.

**Step 5 — No compelling interest; abstract attorney discipline is insufficient.** Vermont's general interest in attorney discipline does not supply a compelling interest in any specific application of Rule 8.4(d) to protected petitioning activity. The *Noerr-Pennington* doctrine and the Petition Clause absolutely immunize the conduct charged. The state has no cognizable — let alone compelling — interest in suppressing advocacy directed to governmental forums that the Constitution places beyond its reach. Defendants have not contested the Complaint's allegation that no compelling interest supports the rule.

**Step 6 — Not narrowly tailored.**  The rule contains no definition of "prejudicial," no scienter requirement, no safe harbor for protected petitioning activity, and no limiting principle of any kind. Every attorney who vigorously alleges government misconduct, every attorney who litigates a losing argument, every attorney who communicates with regulators faces potential Rule

34

8.4(d) charges. A rule that sweeps across the entire universe of aggressive regulatory advocacy without a limiting principle is not narrowly tailored; it is a blanket suppression of disfavored advocacy with a professional-discipline label attached. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

### B. Rule 3.5(d) — "Undignified or Discourteous Conduct Degrading to a Tribunal" (Counts I, III)

**Step 1.** Applied to written PUC filings and oral testimony. Both are speech.

**Step 2.** "Undignified," "discourteous," and "degrading" are pure viewpoint-based classifications. They restrict speech based not on what is communicated but on how — specifically because it is too critical or too blunt toward the tribunal or officials being addressed. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

**Step 3.** Presumptively invalid as both content-based and viewpoint-discriminatory. Viewpoint discrimination is "a form of speech suppression so potent that we must be most wary of its reach." *Matal*, 137 S. Ct. at 1763; *Iancu*, 139 S. Ct. at 2299 (viewpoint discrimination in professional regulation is *per se* unconstitutional).

**Steps 4–5.** Must survive strict scrutiny; no compelling interest identified. Vermont has no compelling interest in requiring attorneys to use courteous language when accusing government officials of corruption in regulatory filings. *Cohen v. California*, 403 U.S. 15, 26 (1971).

**Step 6.** Not narrowly tailored. The rule contains no definition of "undignified," no safe harbor for protected petitioning activity, and no distinction between advocacy directed at government officials (constitutionally protected) and personal attacks on opposing counsel (potentially regulable). The rule is a standardless aesthetic restriction on the tone of advocacy speech.

### C. Rule 4.5 — "Threatening Criminal Charges to Obtain Advantage in a Civil Matter" (Counts I, II)

**Step 1.** Applied to civil RICO allegations in PUC filings and pre-litigation communications — speech.

**Step 2.** Content-based: restricts a specific category of speech (threats of criminal

prosecution) based on subject matter. Viewpoint-based: an attorney who threatens civil litigation faces no sanction; an attorney who threatens to report criminal conduct to the same person faces discipline.

**Step 3 — Presumptively invalid; confirmed overbroad by the ABA's own determination.** In 1983, when the ABA adopted the Model Rules, it deliberately eliminated DR 7-105(A) — the predecessor to Vermont's Rule 4.5 — because the Commission found it was "both redundant and overbroad." ABA Formal Opinion 92-363 (July 6, 1992). The ABA's reasoning: "[A] general prohibition on threats of prosecution…would be overbroad, excessively restricting a lawyer from carrying out his or her responsibility to 'zealously' assert the client's position under the adversary system." *Id.* Vermont retained Rule 4.5 contrary to the ABA's considered professional judgment that the rule's breadth was incompatible with zealous advocacy.

**Step 4.** Must survive strict scrutiny. *Iancu*, 139 S. Ct. at 2299.

**Step 5.** No compelling interest in prohibiting civil RICO claims. Civil RICO is not a criminal charge. *Revson v. Cinque & Cinque*, 221 F.3d 71, 81 (2d Cir. 2000). The ABA itself concluded that when criminal charges are well founded in fact and law, their use by a lawyer does not result in the subversion of the criminal justice system. ABA Formal Op. 92-363. Defendants have not challenged the Complaint's allegation that no compelling interest supports Rule 4.5.

**Step 6.** Not narrowly tailored. Rule 4.5 sweeps across all threats of criminal prosecution regardless of whether the charge is well-founded, related to the civil matter, or made in good faith. Narrow tailoring would require at minimum a well-founded-belief requirement, a relatedness requirement, and an exemption for petitioning activity. Vermont's Rule 4.5 contains none.

D. **Rule 3.3(a)(1) — "Knowing False Statement of Fact or Law to a Tribunal" (Counts V, VI)**

**Steps 1–2.** Applied to legal arguments about Environmental Division jurisdiction and statements to Screening Counsel — speech. Content-based: as applied without the knowing-falsity limitation the rule's text requires, the Petition regulates speech based on whether a tribunal agrees with its content.

**Step 3.**  Presumptively invalid. Although Rule 3.3(a)(1) is facially valid as applied to actual knowing falsehoods, the Petition applies it to a good-faith legal argument that was substantively adjudicated on the merits, stripping out the scienter requirement and creating strict liability for losing advocacy.

**Steps 4–5.**  Must survive strict scrutiny; no compelling interest identified. Vermont has no compelling interest in punishing attorneys for making sincere legal arguments that courts reject. Every losing appellate brief contains statements of law the court found incorrect.

**Step 6.**  Not narrowly tailored as applied. The rule without a knowing-falsity limitation captures every unsuccessful jurisdictional claim, every good-faith statutory interpretation a tribunal rejects, and every factual characterization a regulatory body disagrees with. Narrow tailoring requires at minimum a scienter requirement and a safe harbor for good-faith arguments.

### E. Rule 4.4(a) — "Means With No Substantial Purpose Other Than to Embarrass, Delay, or Burden" (Counts V, VI)

**Steps 1–3.**  Applied to Environmental Division litigation and responses to Screening Counsel — speech. Content- and viewpoint-based: permits the same litigation tactics when a tribunal finds a "substantial purpose," prohibits them when it does not. Presumptively invalid.

**Steps 4–5.**  Must survive strict scrutiny; no compelling interest identified. The First Amendment protects the right to file non-sham litigation regardless of subjective motivation. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983).

**Step 6.**  Not narrowly tailored. "No substantial purpose other than to embarrass" provides no limiting principle. The rule delegates to the tribunal unconstrained discretion to decide which advocacy served a "substantial purpose."

### F. Rule 3.1 — "Meritorious Claims and Contentions" (Count V)

**Steps 1–3.**  Applied to court filings asserting Environmental Division jurisdiction — speech. Content-based; presumptively invalid. A proceeding that generated reasoned judicial opinions on the merits cannot be "objectively baseless.

**Steps 4–5.**  Must survive strict scrutiny; no compelling interest identified. Vermont has no

37

compelling interest in punishing an attorney for a losing jurisdictional argument adjudicated on the merits.

**Step 6.** Not narrowly tailored as applied. Narrow tailoring requires at minimum objective baselessness plus subjective bad faith. The Petition applies Rule 3.1 without that limiting principle, making adverse court outcomes alone sufficient for professional discipline.

G.   **Rule 4.2 — "Communication with Person Represented by Counsel" (Count VII)**

**Steps 1–2.** Applied to communications with Town officials about the PRB proceeding — speech. Content- and viewpoint-based: a private citizen who contacts the same officials about the same matter in a non-legal capacity faces no sanction; an attorney who does so faces discipline.

**Step 3.** Presumptively invalid. The Petition's own text acknowledges Rule 4.2's constitutionally mandated exception for communications with government officials who have authority to act. ECF 1-6 at 21. Applying the rule beyond that acknowledged constitutional exception is itself an admission of overbreadth.

**Steps 4–5.** Must survive strict scrutiny; no compelling interest identified. Vermont has no compelling interest in prohibiting communications with elected government officials about pending government proceedings. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011).

**Step 6.** Not narrowly tailored. Narrow tailoring would limit the prohibition to communications designed to improperly influence pending adjudicative decisions, with a safe harbor for Speech and Petition Clause protected contacts with government officials.

H.   **Rules 4.3 and 3.5(b)(1) — Candor and *Ex Parte* Restrictions as Applied (Counts I, III, IV)**

**Steps 1–6 (Rule 4.3).** Applied to PUC filings and testimony — speech. Content-based; presumptively invalid. Applying Rule 4.3 as strict liability for characterizations a regulatory body disagrees with — without a knowing-falsity requirement — abrogates the common law absolute privilege for statements in proceedings. *Restatement (Second) of Torts* § 586 (1977). Must survive strict scrutiny; no compelling interest in strict-liability candor for regulatory advocacy; not narrowly tailored because it lacks a scienter requirement and a safe harbor for good-faith

characterizations.

**Steps 1–6 (Rule 3.5(b)(1)).** Applied to Plaintiff's email to PUC Chairman McNamara — speech. Content-based: prohibits communications about a specific subject matter. Presumptively invalid; must survive strict scrutiny. Vermont has a compelling interest in preventing communications designed to improperly influence adjudicative decisions, but no compelling interest in prohibiting communications with regulatory officials about proceedings in which property rights are at stake. Not narrowly tailored: the rule bars all communications with quasi-judicial officers about any pending matter without distinguishing protected petitioning from impermissible influence.

## I.   Count VIII — The Cumulative Pattern Theory

Count VIII is entirely derivative and fails under the six-step framework for the same reasons as each predicate rule. Aggregating constitutionally invalid predicates does not cure them — it multiplies the constitutional injury. Where each predicate act is presumptively invalid and Defendants have not established that any rule survives strict scrutiny, using the cumulative pattern as the predicate for disbarment under a truncated reading of *In re Wright*, 131 Vt. 473, 493 (1973) — stripped of its "benefits to himself and family" grounding — is itself facially invalid.

## X.   THE FIRST AMENDMENT RETALIATION CLAIM CANNOT BE DEFERRED BY *YOUNGER* ABSTENTION BECAUSE THE CONSTITUTIONAL VIOLATION IS THE PROCEEDING ITSELF.

*Younger* abstention assumes that the state forum will vindicate the federal plaintiff's constitutional rights if they are meritorious — that the plaintiff will receive an adequate and timely remedy through the state process. That assumption fails when the constitutional violation is the initiation of the proceeding rather than anything that might occur in it. *Dombrowski,* 380 U.S. at 489-90. Requiring a plaintiff to litigate through potentially years of a harassing disciplinary proceeding before obtaining federal relief from that very proceeding would eliminate the remedy entirely.

The Complaint alleges that the PRB proceeding is itself the First Amendment retaliation — that the constitutionally impermissible act is Merrill Bent's and the Defendants' use of the

39

disciplinary machinery to punish and chill Plaintiff's protected petitioning activity. Official reprisal for protected speech "offends the Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal citation and quotation omitted). Requiring Plaintiff to litigate the disciplinary charges to conclusion before seeking federal relief from those same charges does not defer his remedy; it destroys it. *Younger* does not require that result.

The Supreme Court's unanimous decision in *First Choice* confirms that the constitutional injury from government action targeting First Amendment activity arises at the moment of initiation and continues for as long as the government action remains outstanding — not only when it is finally enforced. The Court held that an official's demand targeting protected First Amendment activity "inevitabl[y]" deters the exercise of constitutional rights, and that this deterrence "occurs not just when a demand is enforced, but when it is made and for as long as it remains outstanding." *Id.* (slip op. at 12). Although *First Choice* arose in the context of a government subpoena for donor information, the constitutional principle is identical here: the PRB proceeding targeting Plaintiff's petitioning activity has been outstanding since April 2025 and inflicts ongoing constitutional injury — chilling future advocacy, ECF 1 ¶¶ 35, 40, diverting resources from protected activity, ECF 1 ¶¶ 36, 44, and imposing the reputational harm of pending disbarment charges, ECF 1 ¶¶ 38, 44 — with each passing day. *Younger* abstention, which would require Plaintiff to endure this ongoing injury until the PRB proceeding concludes and potentially longer, does not defer the First Amendment remedy — it eliminates it entirely. The Court in *First Choice* also reaffirmed that the First Amendment "guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely," and that "the right to petition would amount to nothing more than the power to sign one's own name alone" without robust protection against government retaliation for its exercise. *Id.* (slip op. at 6-7). All eight counts of the Petition rest on Plaintiff's exercise of precisely that right.

**XI.   THE FIRST AMENDMENT'S PROTECTION DOES NOT DIMINISH BECAUSE THE SPEAKER IS AN ATTORNEY.**

As argued above, the First Amendment's protection does not diminish because the speaker is an attorney. *Becerra*, 138 S. Ct. at 2371–72, explicitly declined to recognize "professional speech" as a distinct, less-protected category. One decision sometimes cited for the proposition that attorney speech receives reduced First Amendment protection — *Gentile* — on examination confirms rather than defeats Plaintiff's defense as argued above.

*Gentile* concerned an attorney's extrajudicial press-conference statements about a pending criminal prosecution and the narrow state interest of preserving jury impartiality. The Court, per Justice Kennedy, invalidated Nevada's trial-publicity rule as impermissibly vague as applied; a separate majority, per Chief Justice Rehnquist, held that a state may apply a "substantial likelihood of material prejudice" standard to lawyers' extrajudicial statements about pending matters but only if such a standard is narrowly employed as the equivalent to Holmes' "clear and present danger test." *Gentile*, 501 U.S. at 1036. That standard was fashioned to address the specific risk that extrajudicial speech to the press may prejudice a jury in a pending adjudication; it has no application here. Plaintiff's challenged statements were not made to the press. There is no jury involved in any of the charged counts.  The Plaintiff's statements were made in petitioning activity directed to governmental decision-makers — the PUC, the Vermont Legislature, the Vermont courts, and elected Town officials — each of whom is charged by law with acting on the subject matter addressed. No substantial likelihood of material prejudice to any juror or trier of fact has been or could be shown on this record. *Gentile*'s vagueness holding, on the other hand, applies directly and supports Plaintiff: as argued above and as well-pleaded in the Complaint as applied to Plaintiff's conduct, all the Rules that Plaintiff is charged with violating are impermissibly vague.

The Second Circuit's recent decision in *Cerame v. Slack*, 123 F.4th 72 (2d Cir. 2024), reinforces this framework in the attorney-discipline context. *Cerame* held that Connecticut attorneys had standing to bring a pre-enforcement First Amendment challenge to a bar rule because the credible threat of a disciplinary complaint was itself a cognizable injury in fact under Article III. Three principles from *Cerame* apply here with force. *First,* the court held that a First

41

Amendment carve-out embedded in the bar rule is insufficient to eliminate the constitutional injury: "a blanket First Amendment carve-out is not enough" to render a party's fear of discipline imaginary because "speakers can still be required to defend the constitutionality of their speech and are at risk of 'after-the-fact liability.'" *Id*. at 85. The fact that Vermont's bar rules theoretically preserve some undefined First Amendment space does not insulate these specific charges from constitutional challenge or eliminate the present injury. *Second*, the court confirmed that "[a]dministrative action, like arrest or prosecution, [] even when discipline does not ensue, may give rise to harm sufficient to justify pre-enforcement review." *Id*. at 87 (internal citations and quotations omitted). The injuries Plaintiff suffers from the pendency of the PRB proceeding — forced diversion of resources, reputational harm, and chilling of future petitioning activity — are not contingent on ultimate disbarment; they are present now and warrant immediate federal relief. *Third,* the court observed that the "universe of potential complainants is not restricted to state officials" but extends to any person, *id*. — including, as here, an adverse party with direct financial interests in the outcome. The identity of the complainant (Merrill Bent, adverse party and JCB Chair throughout the proceedings at issue) is thus not incidental to the constitutional analysis; under *Cerame*'s framework it is itself part of the constitutional injury. The threat of enforcement by private complainants with adverse interests — rather than neutral officials constrained by prosecutorial guidelines — heightens rather than diminishes the constitutional concern.

## XII.  *YOUNGER* ABSTENTION IS UNCONSTITUTIONAL AS APPLIED TO SECTION 1983 CLAIMS, AND MUST AT MINIMUM BE CONSTRUED NARROWLY TO AVOID SERIOUS CONSTITUTIONAL DIFFICULTIES.

The independent grounds set forth above each defeat abstention on their own terms under existing doctrine. But Plaintiff also presents this Court with a more fundamental argument: *Younger* abstention, as applied to §1983 civil rights claims, is in irreconcilable tension with the Constitution, with Article III's vesting of the federal judicial power, with the Supremacy Clause, and with Congress's binding statutory judgment, enacted in 1871 against the backdrop of state court failure, that federal courts shall provide a remedy for state deprivations of constitutional rights. Even if this Court declines to hold *Younger* unconstitutional on its face, the constitutional

avoidance canon requires that its exceptions be applied broadly and its scope construed narrowly — which, on this record, independently compels denial of the motion to dismiss.

### A. *Younger* Abstention Is a Judge-Made Prudential Doctrine, Not a Constitutional Command, and Congress Has Already Resolved the Balance It Purports to Strike.

The Supreme Court has never held that *Younger* abstention is constitutionally compelled. It is a judge-made prudential doctrine purportedly created to balance federalism concerns against the federal judicial power — a balance the judiciary is not authorized to strike when Congress has already struck it. In 1871, The Civil Rights Act, now codified at 42 U.S.C. § 1983, was enacted precisely because the 42nd Congress determined that state courts and state proceedings were structurally incapable of vindicating federal constitutional rights against state actors. The congressional record is unambiguous: §1983 was designed to create an independent federal remedy accessible in federal court, not to supplement a state remedy that Congress would require the plaintiff to exhaust first. A judicially created abstention doctrine that effectively requires a §1983 plaintiff to complete state proceedings before obtaining federal relief subverts this deliberate congressional choice. It substitutes judicial federalism preferences for a legislative judgment that is the Supreme Court's to follow, not reweigh.

The Supreme Court reaffirmed this principle unanimously just days before this memorandum was filed. In *First Choice*, the Court unanimously reversed lower courts that had dismissed a §1983 First Amendment lawsuit on the ground that the plaintiff had to first litigate its constitutional claims in state court. The Court was categorical: "our cases have already rejected the notion that a litigant must exhaust available state court remedies before seeking to vindicate its federal constitutional rights in federal court under §1983." *Id.* (slip op. at 18). "Section 1983 guarantees a federal forum for plaintiffs who claim unconstitutional treatment at the hands of state officials. Requiring plaintiffs to exhaust state court remedies before they may avail themselves of §1983's promise, we have said, would 'hollow' out the statute." *Id.* (slip op. at 18-19). The Court further held that such a rule "would threaten litigants with a 'preclusion trap'" in which a plaintiff who loses in state court would find its claim forever barred by res judicata — causing § 1983's

43

"promise of a federal forum" to "'di[e] aborning.'" *Id.* Applying *Younger* to require Plaintiff to complete the PRB proceeding before this Court adjudicates his §1983 claims would do precisely what the *First Choice* unanimous Supreme Court held is impermissible: force exhaustion of state proceedings as a predicate to federal constitutional relief, hollowing out §1983's guarantee of a federal forum and exposing Plaintiff to a preclusion trap if the PRB proceeding concludes adversely before this Court can act.

   **B.  *Mitchum v. Foster* Establishes That Congress Expressly Authorized Federal Injunctions of State Proceedings in Section 1983 Cases; *Younger* Abstention Cannot Undo That Authorization.**

In *Mitchum v. Foster*, 407 U.S. 225 (1972), the Supreme Court held that §1983 is an "expressly authorized" exception to the Anti-Injunction Act, 28 U.S.C. § 2283, which otherwise bars federal courts from enjoining state proceedings. The Court reasoned that Congress, in enacting §1983, "authorized the federal courts to issue injunctions in §1983 actions, by expressly authorizing a 'suit in equity' as one of the means of redress." 407 U.S. at 242. This was not a casual holding. The Court traced the legislative history of §1983, the Ku Klux Klan Act, the debates in the 42nd Congress, and the explicit rejection of an amendment that would have required exhaustion of state remedies. *Id.* at 238-41. Congress not only authorized federal equitable relief; it specifically rejected the procedural vehicle — mandatory deference to state proceedings — that *Younger* now requires. The tension between *Mitchum* and *Younger* has never been satisfactorily reconciled. *Mitchum* establishes as a matter of statutory construction and constitutional law that federal courts are authorized — indeed directed — to exercise equitable jurisdiction in §1983 cases. *Younger* abstention, which judicially withdraws that authorization whenever a state proceeding happens to be pending, cannot be reconciled with *Mitchum* without either narrowing *Younger* substantially or discarding it in §1983 cases altogether. This Court should, at minimum, resolve that tension in favor of the congressional command by rejecting abstention.

   **C.  At Minimum, Constitutional Avoidance Requires That *Younger's* Exceptions Be Applied Robustly Rather Than Grudgingly.**

Even for courts that decline to hold *Younger* unconstitutional on its face, the canon of

constitutional avoidance compels a specific interpretive result: when a doctrine's application raises serious constitutional questions, courts must construe that doctrine to avoid them. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). The serious constitutional questions posed by *Younger* abstention in this case — the override of a congressional grant of jurisdiction, the defeat of an expressly authorized remedy, the deference to a structurally biased tribunal, and the elimination of a First Amendment retaliation remedy — are not marginal. They strike at the core of Article III, the Supremacy Clause, and the First Amendment. Applied robustly through the lens of constitutional avoidance, *Younger*'s bad faith exception, inadequate forum exception, facial challenge exception, and the principle that a First Amendment retaliation remedy cannot be extinguished by the very proceeding that is the injury — each of which is independently established in existing doctrine and argued above — must be applied fully and without the grudging construction that would be appropriate only if abstention raised no constitutional concerns. The constitutional avoidance canon is thus an independent, additional reason why each of those exceptions applies here and why the motion to dismiss must be denied.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied, and in the alternative a ruling should be deferred until limited discovery is completed.

Dated: May 4, 2026

Respectfully submitted,
THE PLAINTIFF,
*/s/Thomas Melone*
Thomas Melone
601 S Ocean Blvd.
Delray Beach, FL 33483
Phone: (212) 681-1120
Email: Thomas.Melone@AllcoUS.com